633 A.2d 867

**David DAVIS**

v.

**STATE of Maryland.**

**No. 114, Sept. Term, 1992.**

Court of Appeals of Maryland.

Dec. 9, 1993.

Mark Colvin, Asst. Public Defender, argued and on brief (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Tarra DeShields–Minnis, Asst. Atty. Gen., argued and on brief (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

CHASANOW, Judge.

The Defendant, David Davis, was found guilty of distribution of cocaine and heroin by a jury in the Circuit Court for Baltimore City. Following his sentencing, Davis appealed his conviction, and the Court of Special Appeals affirmed the circuit court. This Court granted certiorari. Davis contends that the circuit court erred in improperly restricting the scope of *voir dire* during jury selection and in permitting the State to make a missing witness argument to the jury during closing arguments. We find that the circuit court did not err in either respect and affirm the decision of the Court of Special Appeals.

## I.

On September 25, 1990, Officer Andrew Bratcher of the Baltimore City Police responded to a call regarding an individual selling narcotics in the 2100 block of Barclay Street. Shortly after his arrival, Officer Bratcher observed from his cruiser the Defendant, David Davis, carrying a small white bag in his hand. Davis placed the white bag beside a set of stairs and approached a car. Officer Bratcher then observed Davis hand the car's driver a small white object. Believing that he had just witnessed a drug transaction, Officer Bratcher exited his cruiser and instructed Davis to place his hands on the top of the purchaser's car. Davis fled, with Officer Bratcher giving pursuit. After apprehending Davis, Officer Bratcher returned to the location of the suspected sale and recovered the white bag that Davis had concealed along the side of the stairs. The white bag contained 48 capsules of cocaine and 18 wax-paper bags of heroin. Davis was subsequently charged with two counts of distribution of a controlled dangerous substance, two counts of possession of a controlled dangerous substance with the intent to distribute, and two counts of possession of a controlled dangerous substance.

Davis pled not guilty to the charges and requested a trial by jury before the Circuit Court for Baltimore City. During *voir dire*, Judge David Ross asked the entire venire panel six questions and dismissed several prospective jurors on the basis of their replies. The six questions were as follows:

"1) ... whether any of the prospective jurors had any knowledge or information about this particular case[;]

2) ... whether any of the jurors knew a) the [Defendant], b) defense counsel, c) the assistant state's attorney, d) Officer Andrew Bratcher, the chief police investigator and only State's witness; or e) Mary Easley, a witness for the defense[;]

3) ... whether any of the jurors 'has been or ... has a close relative who has either been the victim of or has been charged with or convicted of a drug related crime[;]'

4) . . . whether any of the jurors is 'likely to give more or less weight to the testimony of a police officer merely because that person is a police officer[;]'

5) . . . whether any of the jurors 'knows of anything that would keep him or her from giving a fair and impartial verdict in this case[;]'

6) . . . whether any of the jurors 'knows of any reason why he or she should not sit on the jury in this case.' "

*Davis v. State*, 93 Md.App. 89, 92, 611 A.2d 1008, 1009 (1992) (quoting *State v. Davis*, No. 591032032, R. at 3–9 (May 29, 1991)).

Thereafter, Davis requested that the trial judge ask the jury panel "whether anyone on the jury has been a member or is a member of the law enforcement community or whether they have a close relative or friend who is such a member. . . ." Davis argued that the judge's prior "omnibus" questions, pertaining only to whether any member of the panel knew of any reason why they should not sit on the jury, were insufficient. Davis contended that such questions were "unrealistic" and posited for "[w]hat other reason would I get ten peremptory challenges if I cannot make a halfway intelligent decision to strike or not to strike." The trial judge denied Davis's request.

At the conclusion of the trial, the jury found Davis guilty of the two counts of distribution of controlled dangerous substances. Davis appealed and the Court of Special Appeals affirmed his conviction. *Davis v. State*, 93 Md.App. 89, 611 A.2d 1008 (1992). Dissatisfied with the intermediate appellate court's holding, Davis filed a petition for certiorari, which we granted. *Davis v. State*, 329 Md. 22, 616 A.2d 1286 (1992).

## II.

Davis's principal contention is that the trial court abused its discretion in refusing to ask whether any of the jurors were, or were associated with, law enforcement personnel. Davis argues that he was entitled to such a question since it may have led to the disqualification for cause of one or more of the

prospective jurors or, at the very least, would have allowed him to intelligently exercise his peremptory challenges. For the reasons stated below, we disagree.

The principles governing jury *voir dire* are well established in Maryland. As we have noted on several occasions, there is no statute in Maryland prescribing the manner in which *voir dire* is to be conducted or regulating the objects of inquiry during *voir dire*. *See Bedford v. State*, 317 Md. 659, 670, 566 A.2d 111, 116–17 (1989). Absent any statutory guidance from the General Assembly, this Court has consistently looked to Maryland's common law for guidance. The common law of this State vests trial judges with discretion to regulate *voir dire*. The trial judge typically questions the prospective jurors, although he or she has discretion to permit counsel to conduct the inquiry. *Moore v. State*, 7 Md.App. 495, 503, 256 A.2d 337, 341–42, *cert. denied*, 256 Md. 746, *cert. denied*, 398 U.S. 913, 90 S.Ct. 1714, 26 L.Ed.2d 76 (1970); Maryland Rule 4–312(d). Additionally, the scope of *voir dire* and the form of the questions propounded rests firmly within the discretion of the trial judge. *Casey v. Roman Catholic Archbishop*, 217 Md. 595, 605, 143 A.2d 627, 631 (1958). The trial judge's discretion regarding the scope of a proposed avenue of *voir dire* is governed by one primary principle: the purpose of "the inquiry is to ascertain 'the existence of cause for disqualification and for no other purpose.'" *McGee v. State*, 219 Md. 53, 58, 146 A.2d 194, 196 (1959) (quoting *Adams v. State*, 200 Md. 133, 140, 88 A.2d 556, 559 (1952) (citations omitted)). Where parties to the litigation direct their inquiries concerning a specific cause for disqualification, they have "a *right* to have questions propounded to prospective jurors" during *voir dire*. *Casey*, 217 Md. at 605, 143 A.2d at 631 (emphasis in original); *see Bedford*, 317 Md. at 670, 566 A.2d at 116 ("Maryland Declaration of Rights Article XXI guarantees a defendant the right to examine prospective jurors to determine whether any cause exists for a juror's disqualification."). "Questions not directed to a specific ground for disqualification but which are speculative, inquisitorial, catechising or 'fishing', asked in the aid of deciding on peremptory challenges, may be refused in

the discretion of the court, even though it would not have been error to have asked them." *McGee*, 219 Md. at 58–59, 146 A.2d at 196; *see also Kujawa v. Baltimore Trans. Co.*, 224 Md. 195, 201, 167 A.2d 96, 98 (1961) (stating that trial court's denial of *voir dire* question, in the nature of a "fishing" expedition, was clearly not an abuse of discretion). We must view Davis's challenge in the context of this framework.

### A.

Davis first contends that the trial judge abused his discretion in refusing to ask his proposed question because, in a case where "the sole issue ... is the credibility of the police officer as [o]pposed to [the defendant], a *voir dire* question concerning law enforcement employment or association may well lead to the disqualification for cause of one or more of the prospective jurors." We must reject Davis's argument.

■ As the Court noted in *Langley v. State*, a fundamental tenet underlying the practice of trial by jury is that each juror, as far as possible, be "impartial and unbiased." *Langley v. State*, 281 Md. 337, 340, 378 A.2d 1338, 1339 (1977) (citing *Waters v. State*, 51 Md. 430, 436 (1879)). The objective of this tenet is to assemble a group of jurors capable of deciding the matter before them based solely upon the facts presented, " 'uninfluenced by any extraneous considerations....' " *Id.* The function of *voir dire* is closely related to this fundamental tenet of trial by jury and, thus, the mandatory scope of *voir dire* in Maryland only extends to those areas of inquiry reasonably likely to reveal cause for disqualification. There are two areas of inquiry that may uncover cause for disqualification: (1) an examination to determine whether prospective jurors meet the minimum statutory qualifications for jury service, *see* Maryland Code (1974, 1989 Repl.Vol., 1992 Cum.Supp.), Courts & Judicial Proceedings Article, § 8–207; or (2) " 'an examination of a juror ... conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any

collateral matter *reasonably liable* to unduly influence him.' "
*Bedford*, 317 Md. at 671, 566 A.2d at 117 (quoting *Corens v. State*, 185 Md. 561, 564, 45 A.2d 340, 343 (1946) (emphasis added)).[1]

In addition, this Court has identified several areas of inquiry where, if reasonably related to the case at hand, a trial judge must question prospective jurors. *See Bowie v. State*, 324 Md. 1, 15, 595 A.2d 448, 455 (1991) (holding trial judge erred in failing during *voir dire* to inquire into prospective jurors' possible racial bias); *Casey*, 217 Md. at 606–07, 143 A.2d at 632 (trial judge erred in failing to inquire about religious bias); *Corens*, 185 Md. at 564, 45 A.2d at 343–44 (holding that State has a right to challenge prospective juror for cause based upon juror's unwillingness to convict founded upon circumstantial evidence in death penalty case); *Langley*, 281 Md. at 349, 378 A.2d at 1344 (holding that where a principal part of the State's case hinges upon the credibility of a police officer's testimony versus the credibility of the defendant, court must ask whether prospective juror would give more weight to police officer's testimony solely because of his or her official status). These areas entail potential biases or predispositions that prospective jurors may hold which, if present, would hinder their ability to objectively resolve the matter before them.

 Davis's proposed *voir dire* inquiry does not relate to cause for disqualification. Davis merely sought to discover whether any prospective juror was either a law enforcement

---

1. We must also note that these required areas of inquiry were qualified under the common law. Under common law rules of *voir dire*, jurors need not answer any questions likely to humiliate or embarrass them. The determination of which questions needed to be answered, however, rested within the trial judge's discretion. *See* J. Alexander Tanford, *An Introduction to Trial Law*, 51 Mo.L.Rev. 627, 638–39 (1986). Today, even where the scope of the proposed *voir dire* questioning is otherwise permissible but potentially embarrassing or humiliating, the trial judge should exercise discretion in structuring the questions in a manner which would avoid unnecessarily embarrassing the venire panel. Such questions should be worded in a way that potentially embarrassing responses should be given at the bench, rather than before open court.

officer or was related to or associated with any law enforcement officers. Assuming that the court would have allowed such an inquiry, an affirmative answer would not have established cause for disqualification. First, the fact that a prospective juror is or was a member of a law enforcement body does not automatically disqualify that venire person. *See Harris v. State,* 82 Md.App. 450, 470, 572 A.2d 573, 583 (trial judge did not err when he failed to strike former state trooper for cause where trooper indicated that he was able to render fair and impartial judgment despite earlier employment), *cert. denied,* 320 Md. 800, 580 A.2d 218 (1990). Likewise, the mere fact that a prospective juror is related to or associated with members of the law enforcement community does not constitute cause for disqualification. *Goldstein v. State,* 220 Md. 39, 45, 150 A.2d 900, 904 (1959); *Shifflett v. State,* 80 Md.App. 151, 156, 560 A.2d 587, 589 (1989), *aff'd on other grounds,* 319 Md. 275, 572 A.2d 167 (1990); *Baker v. State,* 3 Md.App. 251, 254, 238 A.2d 561, 564 (1968). In general, the professional, vocational, or social status of a prospective juror is not a dispositive factor establishing cause to disqualify. Rather, the proper focus is on the venire person's state of mind, and whether there is some bias, prejudice, or preconception. Short of those instances where there is a demonstrably strong correlation between the status in question and a mental state that gives rise to cause for disqualification, mere status or acquaintance is insufficient to establish cause for disqualification of a prospective juror. The fact that a prospective juror is employed as, related to, or associated with a law enforcement officer does not establish that the prospective juror has any undue bias or prejudice that will prevent that person from fairly and impartially determining the matter before them. *See Goldstein,* 220 Md. at 44–45, 150 A.2d at 904. The inquiry must instead focus on the venire person's ability to render an impartial verdict based solely on the evidence presented. We believe the Court of Special Appeals accurately stated this principle in *Borman v. State:*

"The purpose of the voir dire examination is to ascertain the existence of cause for disqualification and for no other purpose. Neither mere acquaintance with an individual or

group, nor mere relationship to witnesses, other than parties, is sufficient basis for challenging a prospective juror for cause. Bias on the part of prospective jurors will never be presumed, and the challenging party bears the burden of presenting facts, in addition to mere relationship or association, which would give rise to a showing of actual prejudice." (Citations omitted).

*Borman v. State,* 1 Md.App. 276, 279, 229 A.2d 440, 441–42 (1967).

 Davis next argues that, "[w]hile an affirmative answer to the proposed question may not, as a matter of law, result in disqualification of the prospective juror for cause, the answer, by itself or together with the juror's manner and demeanor, may persuade the trial court, in the exercise of its discretion, to excuse the juror for cause." He asserts that such "follow-up questioning may reveal facts, predilections, or unacknowledged prejudices...." Davis's suggested approach to *voir dire,* however, finds no support in the law of Maryland. Davis suggests that a party be allowed to incrementally question prospective jurors in a piecemeal fashion until the party can uncover grounds for a challenge for cause. We see no difference between this approach and the practice in some other states that permit parties to use *voir dire* as a means to more effectively exercise peremptory challenges—a practice that this Court has long since rejected. Where parties do not direct their questions to grounds for disqualification but such questions are "speculative, inquisitorial, catechising or 'fishing', asked in aid of deciding on peremptory challenges," a trial judge has the discretion to refuse to ask them. *McGee,* 219 Md. at 58–59, 146 A.2d at 196. We find that the trial judge did not abuse his discretion in refusing to ask a question not addressing a potential ground for disqualification. Although the trial judge possessed the discretion to allow Davis's proposed line of inquiry, he was not required to do so.

**B.**

Perhaps sensing the impending demise of his initial contention, Davis next requests that this Court reconsider the frame-

work in which Maryland courts conduct *voir dire.* Davis recognizes that "[u]nder current Maryland law, *voir dire* examination . . . not aimed at exposing the existence of cause for disqualification, but which may aid the parties in exercising their right of peremptory challenge . . . may be refused in the discretion of the court even though it would not be error to ask them." Davis, however, points to what he considers an "overwhelming majority" of states that have adopted the position that a criminal defendant is "entitled to make reasonable inquiries of prospective jurors so that he may intelligently exercise his right of peremptory challenge." Not surprisingly, Davis urges us to reconsider the long settled law of this State and adopt this alternative system of *voir dire.*

Davis correctly recognizes that there exist two schools of thought among the various courts throughout the country with regard to the scope of *voir dire. See* J. Alexander Tanford, *An Introduction to Trial Law,* 51 Mo.L.Rev. 627, 638–40 (1986). These two camps differ largely in the mandatory scope of examination of prospective jurors. The Maryland system requires that the trial judge allow inquiries reasonably likely to disclose cause for disqualification with all other inquiries subject to the trial judge's discretion. In stark contrast is the system that Davis wishes us to adopt. This alternative system requires that a trial judge inquire about any topic or subject matter which may be reasonably related to the intelligent exercise of peremptory challenges.

 While the extent of questioning under either system of *voir dire* may differ, the desire to obtain a fair and impartial jury is at the heart of both. Likewise, the constitutional imperative that the criminal defendant receive a fair trial remains constant. There is no constitutionally protected right to exercise peremptory challenges. *See Frazier v. United States,* 335 U.S. 497, 505 n. 11, 69 S.Ct. 201, 206 n. 11, 93 L.Ed. 187, 195 n. 11 (1948); *United States v. Wood,* 299 U.S. 123, 145, 57 S.Ct. 177, 185, 81 L.Ed. 78, 88 (1936); *Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 30, 63 L.Ed. 1154, 1156 (1919); *see also* Raymond J. Broderick, *Why the*

*Peremptory Challenge Should Be Abolished,* 65 Temple L.Rev.. 369, 374–75 (1992) (examining evolution of Sixth Amendment and indicating that drafters of Bill of Rights considered an express guaranty of peremptory challenges in Sixth Amendment but abandoned the idea). The concept of a fair trial only entitles a defendant to a jury composed of impartial and unbiased jurors, not a jury composed of what a litigant views as ideal or model jurors predisposed to accept his or her theory of the case. *See Whittemore v. State,* 151 Md. 309, 315, 134 A. 322, 324 (1926) (stating that "the law does not aid a party in an effort to select jurymen in hope of favor from them, for that is contrary to the object sought by the law"). In the absence of a rigid constitutional requirement concerning the scope of *voir dire,* states have had to make a policy determination with respect to which method of *voir dire* best fits the needs of their justice system. In setting this policy, courts and legislatures have had to balance the parties' desires for extensive *voir dire* and the justice system's obligation to provide litigants with both an impartial as well as efficient method of administering justice.

Nearly ninety years ago this Court, in *Handy v. State,* 101 Md. 39, 60 A. 452 (1905), struck such a policy balance and established the general principles governing the scope of *voir dire* in Maryland. In *Handy,* this Court considered whether a trial judge was bound to ask a prospective juror a *voir dire* question submitted for the purpose of enlightening a party as to the propriety of exercising peremptory challenges. In the absence of any statute, the Court acknowledged that the common law provided a trial judge with the discretion to ask such questions but the Court rejected the defendant's contention that the trial judge was obligated to propound such questions to the jury. In reaching this conclusion, the Court stated "[w]e are aware that there are decisions to the contrary in other courts of equal authority and reputation, but such knowledge as we possess of the experience in practice under those decisions does not commend them to our adoption." 101 Md. at 43, 60 A. at 453.

Twenty-one years later, in *Whittemore*, 151 Md. 309, 134 A. 322, this Court once again had an opportunity to reassess the policy choice made in *Handy* concerning the scope of *voir dire*. In *Whittemore*, the defendant sought to question a prospective juror concerning that juror's age and prior occupation without specifying any potential cause for disqualification. The trial judge, relying on *Handy*, refused to allow the inquiry, reasoning that "he would be glad to have them submit other questions that would affect the eligibility of the juror and not for the purpose of enlightening counsel as to whether there should be a peremptory challenge." 151 Md. at 312, 134 A. at 322. On appeal, the defendant challenged the trial judge's interpretation of *Handy*. This Court affirmed the trial judge and crystallized the principles that had been implicit in *Handy*. The Court held:

> "The rule is, then, that questions, not directed to a specific reason for disqualification and exclusion by the court, may be refused in the court's discretion. . . .

> The questions excluded in this case were for no specified purpose, and apparently with no question of disqualification in mind, but were merely beginning a process of examining at large, in order to form impressions and preferences, which, while they might properly be made the ground for peremptory challenges, would not test the eligibility of the jurymen."

151 Md. at 315–16, 134 A. at 324.

In addition to clarifying the holding of *Handy*, the Court in *Whittemore* reexamined the policy underlying the adoption of a rule mandating *voir dire* in only those areas relating to a specific cause of disqualification. The Court noted the following:

> "Judge Pearce writing the [*Handy*] opinion for the Court said, 'we are aware that there are decisions to the contrary in other courts of equal authority and reputation, but such knowledge as we possess of the experience in practice under those decisions does not commend them to our adoption'—in this referring, presumably, to reports from other jurisdic-

tions of seemingly unreasonable encumbering and prolongation of the work of securing a jury to proceed with the trial."

151 Md. at 314, 134 A. at 323 (quoting *Handy,* 101 Md. at 43, 60 A. at 454).

This Court initially adopted the rules concerning the scope of *voir dire* because allowing more extensive inquiry would unduly tax the efficiency of Maryland's judicial system. Although some litigants might benefit from broader mandatory *voir dire,* a greater number of citizens would be hindered due to the accompanying decline in their ability to gain prompt resolution of their litigation. In *Handy* and *Whittemore,* this Court decided that any such detrimental effects outweighed the marginal gains springing from unlimited *voir dire.* Writing for the Court of Special Appeals in the instant case, Judge Moylan vividly captured the essence of this policy choice. In comparing Davis's proposed system of expanded *voir dire* with Maryland's current system, Judge Moylan wrote the following:

"There is, however, an opposing school of thought that looks upon such indulgence as errant, if not grotesque, foolishness.... In terms of the profligate waste of precious courtroom and human resources, it looks upon any fractional gain from unlimited *voir dire* as a minimally incremental benefit that soon passes the point of diminishing returns. In a world of finite resources, if the fabled 'day in court' is permitted casually to multiply into twenty days in court, the inevitable consequence is that, by the inexorable law of mathematics, nineteen other litigants are denied any time in court at all...."

*Davis v. State,* 93 Md.App. 89, 94, 611 A.2d 1008, 1010 (1992).

Davis cites numerous other states that hold a contrary view to Maryland's and invites this Court to reverse the policy decision it made nearly a century ago. We must, however, decline any such invitation. Several considerations underpin our decision to remain faithful to the *Handy* rule and maintain this State's present course. First, the present-day need for judicial efficiency is even greater than it was at the turn of the

century; crowded dockets abound with little chance of adequately expanding judicial resources in the near future.

Furthermore, the trend for expansive *voir dire* appears to be waning. For example, prior to 1981, California followed a rule which limited the scope of *voir dire* to questions reasonably likely to uncover cause for disqualification and excluded those asked to aid the use of peremptory challenges. *See People v. Edwards,* 163 Cal. 752, 127 P. 58, 58–60 (1912) and citations therein. In *People v. Edwards,* 163 Cal. at 753, 127 P. at 58, the California Supreme Court limited the scope of *voir dire* in criminal cases to avoid what it perceived of as a growing trend of unnecessarily prolonging court proceedings by unlimited and tedious examination of prospective jurors.

In 1981, however, the California Supreme Court reassessed its prior rule and abandoned the *Edwards* line of cases, thereby expanding the scope of permissible *voir dire* questioning. *People v. Williams,* 29 Cal.3d 392, 403–04, 174 Cal.Rptr. 317, 322, 628 P.2d 869, 871 (1981). In *People v. Williams,* the court found that the *Edwards* rule was too restrictive, and it did not effectively uncover juror partiality. 29 Cal.3d at 401, 174 Cal.Rptr. at 321, 628 P.2d at 873. The *Williams* court reasoned that people are governed by subconscious biases that are only discoverable upon more extensive *voir dire* questioning. 29 Cal.3d at 402–03, 174 Cal.Rptr. at 322–23, 628 P.2d at 873. Thus, the California Supreme Court adopted a new rule that *voir dire* should include reasonable inquiries made to assist counsel in the intelligent exercise of peremptory challenges. 29 Cal.3d at 398, 174 Cal.Rptr. at 319, 628 P.2d at 871.

When the California Supreme Court discarded the *Edwards* rule, which had limited *voir dire* to grounds for cause, the court failed to foresee the effects that broadened *voir dire* would cause. There was a great deal of dissatisfaction with the newly expanded right of *voir dire,* because of the additional burdens that the *Williams* rule placed upon California's criminal justice system. As one distraught trial judge wrote in the aftermath of the *Williams* decision:

"Many trial judges have decided that if exclusion of such a question [to aid in the use of peremptory challenges, no matter how ridiculous] is grounds for reversal, it is too risky to rule out almost any line of inquiry.... In the large municipal court where I recently completed 11 years' service, voir dire in driving-under-the-influence cases now routinely consumes a minimum of two days, frequently three. Young lawyers recite their questions from dog-eared sets of Xeroxed inquiries, sometimes hardly glancing up to the faces of the prospective jurors. When voir dire is finally over, the evidence can normally be presented in a little over a day."

Roderic Duncan, *Putting a Cap on Voir Dire*, 7 Cal.Lawyer 14, 58 (March 1987).

In response to the apparent waste of judicial resources in the criminal arena, due to extensive *voir dire* required under *Williams,* the voters of California passed Proposition 115. *People v. Boulerice,* 5 Cal.App.4th 463, 474–76, 7 Cal.Rptr.2d 279, 285–86 (1992). The California voters decided that the *Williams* decision and the existing statutes had " 'unnecessarily expanded the rights of accused criminals far beyond that which is required by the United States Constitution, thereby unnecessarily adding to the costs of criminal cases, and diverting the judicial process from its function as a quest for truth.' " 5 Cal.App.4th at 474–75, 7 Cal.Rptr.2d at 286 (quoting Ballot Pamphlet, Proposed Amends. to Cal. Const., at 33 (June 5, 1990)). Proposition 115 was enacted " 'in order to restore balance and fairness to [the] criminal justice system.' " 5 Cal.App.4th at 474, 7 Cal.Rptr.2d at 285–86. As a result, Proposition 115 established two separate *voir dire* provisions for criminal and civil trials. *See* Cal.Civ.Proc.Code §§ 222.5, 223 (Supp.1993). While retaining the *Williams* rule for civil proceedings in § 222.5 of the California Code of Civil Procedure, Proposition 115 returned to the *Edwards* rule of limited *voir dire* for criminal trials. *Id.* § 223 (entitled "Criminal cases; voir dire examination by court and counsel"). Section 223 of the California Code provides the following:

"In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper....

Examination of prospective jurors shall be conducted only in the aid of the exercise of challenges for cause."

Thus, California experimented with both forms of jury *voir dire* and ultimately returned to a more limited form of *voir dire* questioning in the criminal context. The populace clearly decided, as a matter of state law and policy, that any potential benefits to criminal defendants due to expansive questioning of prospective jurors was outweighed by the burdens imposed upon their State's system of justice. California's reaction to expanded *voir dire* reinforces our view that we should not change Maryland's current *voir dire* practices.

Finally, we note that a litigant's unbridled use of peremptory challenges has come under intense scrutiny and is the subject of some criticism. *See Batson v. Kentucky,* 476 U.S. 79, 107, 106 S.Ct. 1712, 1728, 90 L.Ed.2d 69, 94 (1986) (Marshall, J., concurring) ("The inherent potential of peremptory challenges to distort the jury process by permitting the exclusion of jurors on racial grounds should ideally lead the Court to ban them entirely from the criminal justice system."); *Gilchrist v. State,* 97 Md.App. 55, 78, 627 A.2d 44, 55 (1993) (Wilner, C.J., concurring) (stating that, in light of *Batson,* peremptory challenges should be eliminated as a matter of public policy due to the fact that "precious judicial time and resources are being sidetracked ..."); *People v. Bolling,* 79 N.Y.2d 317, 326, 582 N.Y.S.2d 950, 956, 591 N.E.2d 1136, 1142 (1992) (Bellacosa, Titone, JJ., & Wachter, C.J., concurring) (Where several judges invited the legislature to abolish peremptory challenges, stating "[p]eremptories have outlived their usefulness and, ironically, appear to be disguising discrimination—not minimizing it...."). Peremptory challenges have even been abolished in England, the birthplace of the

peremptory challenge. *See generally* Raymond J. Broderick, *Why the Peremptory Challenge Should Be Abolished,* 65 Temple L.Rev. 369 (1992). Peremptory challenges have also been criticized for allowing jury selection based on stereotypes. An example of these stereotypes, which might be considered offensive today, can be found in Clarence Darrow's approach to jury selection:

> " 'Never take a German; they are bullheaded. Rarely take a Swede; they are stubborn. Always take an Irishman or a Jew; they are the easiest to move to emotional sympathy. Old men are generally more charitable and kindly disposed than young men; they have seen more of the world and understand it.' "

Robert F. Hanley, *Getting to Know You,* 40 Am.U.L.Rev. 865, 865–66 (1991) (quoting *The Oxford Book of Legal Anecdotes* 101 (M. Gilbert 1986)).

The number of peremptory challenges available to litigants is regulated by the legislature. *See* Md.Code (1974, 1989 Repl.Vol.), Courts and Judicial Proceedings Art., § 8–301. The future of peremptory challenges is a legislative question. If the General Assembly wishes to expand or contract those statutory rights or the manner in which they are exercised, it may do so. Until such time, we will continue to follow the principles adopted in *Handy* and *Whittemore* and applied consistently for the greater part of this century. *See Bowie v. State,* 324 Md. 1, 595 A.2d 448 (1991); *Bedford v. State,* 317 Md. 659, 566 A.2d 111 (1989); *Couser v. State,* 282 Md. 125, 383 A.2d 389, *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978); *Langley v. State,* 281 Md. 337, 378 A.2d 1338 (1977); *Kujawa v. Baltimore Trans. Co.,* 224 Md. 195, 167 A.2d 96 (1961); *McGee v. State,* 219 Md. 53, 146 A.2d 194 (1959); *Corens v. State,* 185 Md. 561, 45 A.2d 340 (1946). Accordingly, we must reject Davis's contention and affirm the circuit court. Although it was within the trial judge's discretion to allow the line of questioning, he was not required to do so. The trial judge did not abuse his discretion by refusing to propound Davis's question to the prospective jurors.

 We hasten to add, however, that where the parties identify an area of potential bias and properly request *voir dire* questions designed to ascertain jurors whose bias could interfere with their ability to fairly and impartially decide the issues, then the trial judge has an obligation to ask those questions of the venire panel. Merely asking general questions, such as, "is there any reason why you could not render a fair and impartial verdict," is not an adequate substitute for properly framed questions designed to highlight specific areas where potential jurors may have biases that could hinder their ability to fairly and impartially decide the case. Those *voir dire* questions, however, should be framed so as to identify potential jurors with biases which are cause for disqualification, rather than merely identifying potential jurors with attitudes or associations which might facilitate the exercise of peremptory challenges.

## III.

Davis's final contention focuses upon the propriety of a portion of the State's closing argument. At trial, Davis presented both his own testimony and the testimony of Mary Easley that he was only in the vicinity of the alleged drug sale because he was on his way to get food for his children. Easley testified that a woman identified only by her forename, Lakeesha, whom Easley stated was Davis's wife and mother of his children, gave Davis $10 in food stamps in order to buy food for their children. No food stamps were found on Davis's person at the time of his arrest. Although Davis did not call Lakeesha to testify in his defense, she sat in the courtroom throughout the entire trial.

In closing argument, the prosecuting attorney stated:

"Now, I think you would find something interesting in this case.

Defendant's wife, or girlfriend, came outside and saw him with the police. Allegedly the Defendant had been given food stamps by her via Ms. Easley. She was in the house when Deon allegedly came in and said that [the] Defendant

had been arrested. Now this woman sat in the courtroom everyday the entire trial; she was clearly in a better position to know what happened other than Defendant. She was never called to testify.

[DEFENSE COUNSEL]: Objection.

COURT: Overruled.

[The Prosecutor continued:] She could have told you that she gave the food stamps to the Defendant. She could have told you where exactly he was when she went outside to see where he was. . . .

Why didn't she come in and tell you that that's where he was as opposed to Ms. Easley who didn't even see anything [and] stayed in the house? Doesn't make sense."

Davis argues that the State's reference to his failure to call Lakeesha was improper and the trial judge erred in overruling his objection to it.

In 1975, this Court approved the general statement of the missing witness rule in the context of criminal trials. *Christensen v. State,* 274 Md. 133, 134–35, 333 A.2d 45, 46 (1975). We stated the following:

" 'The failure to call a material witness raises a presumption or inference that the testimony of such person would be unfavorable to the party failing to call him, but there is no such presumption or inference where the witness is not available, or where the testimony is unimportant or cumulative, or where he is equally available to both sides.' "

*Id.* (quoting 1 Underhill, *Criminal Evidence* § 45 (rev. 6th ed. P. Herrick, 1973)). This Court revisited the issue in *Robinson v. State,* 315 Md. 309, 554 A.2d 395 (1989). Writing for the *Robinson* Court, Judge McAuliffe explained the function and operation of the missing witness rule in the context of a jury instruction:

"There is nothing mysterious about the use of inferences in the fact-finding process. Jurors routinely apply their common sense, powers of logic, and accumulated experiences in life to arrive at conclusions from demonstrated sets of facts. Even had there been no instruction concerning the

availability of this inference, we think it likely that among the first questions posed in the deliberation of this case would have been, 'Why didn't the defendant produce [the missing witness]?' Only if, as a matter of law, the unfavorable inference could not have been drawn by the jurors would the trial judge have been authorized to prohibit the prosecutor from posing that same question in argument."

315 Md. at 318-19, 554 A.2d at 399.

In addressing this issue below, the Court of Special Appeals, relying upon *Bruce v. State,* 318 Md. 706, 729-31, 569 A.2d 1254, 1266-67 (1990), rejected Davis's contention and found that since Lakeesha was the "common-law" wife and mother of Davis's child she was peculiarly within his power to produce.[2] Davis contends that both the intermediate appellate court and the trial court erred. Davis reasons that, since Lakeesha sat in the courtroom throughout the trial and was subject to subpoena, she was equally available to both sides, and thus the use of the missing witness argument was improper. We disagree.

■■■■ We find the trial judge did not err in permitting the State to make a missing witness argument in the instant case. Although the State could have called Lakeesha as a witness, this fact is not dispositive. As the District of Columbia Circuit Court of Appeals noted, the " 'availability' of a witness to the Government must be judged 'practically as well as physically.' ... And whether a person is to be regarded as equally available to both sides may depend not only on physical availability but on his 'relationship' to the parties." *U.S. v. Young,* 463 F.2d 934, 942 (D.C.Cir.1972) (footnotes omitted) (citing *Burgess v. United States,* 440 F.2d 226

---

**2.** We note that it is not clear from the record whether Lakeesha was Davis's wife or domestic partner. While Davis's witness, Mary Easley, and his attorney referred to Lakeesha as Davis's wife, Davis himself referred to Lakeesha only as his girlfriend. It is undisputed that Lakeesha was indeed the mother of the Defendant's children and that he provided support for those children.

(D.C.Cir.1970); *Stewart v. United States,* 418 F.2d 1110, 1115 (D.C.Cir.1969)).

The very close relationship that existed between the Defendant and the potential witness was significant in satisfying the requirement that the witness not be equally available to both sides. As this Court noted when setting out the missing witness rule in both *Christensen* and *Robinson:* " 'The presumption or inference that the testimony of a missing witness would be unfavorable is applied most frequently when there is a relationship between the party and the witness, such as a family relationship, an employer-employee relationship, and, sometimes, a professional relationship.' " *Robinson,* 315 Md. at 314–15, 554 A.2d at 397 (citing *Christensen,* 274 Md. at 134–35, 333 A.2d at 46, in turn quoting 1 Underhill, *Criminal Evidence* § 45 (rev. 6th ed. P. Herrick, 1973)). Underlying this principle is the realization that despite a party's theoretical ability to subpoena the witness's testimony, there is a practical concern that certain relationships may engender a very strong bias which would undermine the utility of that witness's testimony. *See State v. Michaels,* 454 So.2d 560, 562 (Fla.1984); *State v. Karnes,* 608 S.W.2d 455, 457 (Mo.App. 1981).

Whether labeled as husband-wife or domestic partners, the existent relationship between Davis and Lakeesha was sufficiently close that as a practical matter Lakeesha was not equally available to the State. *See Hale v. United States,* 361 A.2d 212, 216 (D.C.1976). Lakeesha was the mother of Davis's children. Davis, Lakeesha, and the children lived together as a family, and Davis provided support for the children. Their relationship was at least the functional equivalent of marriage and family—relationships that would substantially hinder the State's access to accurate testimony from the witnesses. *Cf. Michaels,* 454 So.2d at 562; *State v. Reid,* 193 Conn. 646, 480 A.2d 463, 473 (1984).

Our holding here is in accord with our decision in *Bruce v. State,* 318 Md. 706, 729–31, 569 A.2d 1254, 1267 (1990). There we indicated that, at least in the context of the State's closing

argument, the existence of a girlfriend-boyfriend relationship was sufficient to satisfy the missing witness rule. In *Bruce*, the defendant and several companions murdered a number of persons in a drug-related transaction. Bruce and his companions then fled the State. Among this group was Bruce's girlfriend. At trial, Bruce testified that he had not fled the jurisdiction but that he and his girlfriend simply traveled out of the State pursuant to their prior plans. Additionally, one of the issues during the trial was Bruce's incriminating actions in one of the out-of-state hotel rooms while his girlfriend was present. Bruce failed to call his girlfriend to testify and the State made a missing witness argument during its closing remarks.

On appeal, Bruce challenged the State's closing argument as improper. Bruce contended that the missing witness argument was inappropriate since the testimony of his girlfriend would have been cumulative. We affirmed the trial court, finding that the proposed subject matter of the girlfriend's testimony, "coupled with the testimony about her close relationship to [the defendant]," was sufficient to engender a missing witness argument. 318 Md. at 730–31, 569 A.2d at 1267.

In light of *Bruce, Christensen,* and *Robinson,* the judge did not err in permitting the State to make a missing witness argument to the jury in the instant case. There was a sufficient factual basis to support the inference that Davis failed to call Lakeesha because her testimony would have been harmful. Davis made her testimony material when he testified that he was only in the area because Lakeesha sent him to the store with food stamps to get food for their children. Lakeesha could have buttressed Davis's defense of mistaken identity. Additionally, the relationship between Davis and Lakeesha was sufficient to indicate that she was not equally available to the State. There was a sufficient factual predicate to permit the State to argue the missing witness inference to the jury. *Robinson,* 315 Md. at 318–19, 554 A.2d at 400.

 We should also point out that the missing witness rule was raised by the State's closing argument rather than the judge's instruction to the jury which may have been a factor in the trial judge's decision. The missing witness inference may arise in one of two contexts. A party may request that a trial judge instruct the jury on the operation and availability of the inference where all the elements of the rule are present. *See Christensen v. State*, 274 Md. 133, 333 A.2d 45 (1975). Additionally, a party may wish to call the jury's attention to this inference directly during closing arguments. *See Bruce*, 318 Md. at 729–31, 569 A.2d at 1266–67. As a matter of necessity, the requirements of the missing witness rule must be more rigidly applied where the inference is used in the former context. Where a party raises the missing witness rule during closing argument, its use is just that—an argument. Trial judges typically instruct the jury, as in this case, that the parties' arguments do not constitute evidence. Furthermore, the opposing side also has an opportunity to refute the argument and counter with reasons why the inference is inappropriate.

 In contrast to the argument context is the trial judge's instruction to the jury. In the latter case, the inference is communicated to the jury as part of the judge's binding jury instructions, creating the danger that the jury may give the inference undue weight. At the very least, a trial judge's jury instruction on the missing witness inference may have the effect of overemphasizing just one of the many proper inferences that a jury may draw. As a result, where the jury instruction is the vehicle by which the missing witness inference is brought to the jury's attention, the trial court should be especially cautious and closely abide by the requirements set out in *Christensen*. A trial judge has discretion to deny a missing witness instruction, leaving the matter to closing arguments, even when the facts would support the inference. *Robinson*, 315 Md. at 319 n. 7, 554 A.2d at 399–400 n. 7. In the instant case, the trial judge properly permitted the State to argue the missing witness inference to the jury.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.*

McAULIFFE, Judge, concurring.

I concur in the result. The Court cannot mandate the asking of voir dire questions designed to aid in the exercise of peremptory challenges because it is impossible logically to frame a limitation on the questions that a judge would then be required to ask. A peremptory challenge may be used for any reason that does not involve impermissible discrimination; thus, the field of inquiry becomes virtually unlimited.

The real problem presented by this case is the method to be used in propounding voir dire questions designed to develop information that could lead to a challenge for cause. Experienced trial counsel and judges realize that a sequence of questions is sometimes the most effective method of focusing the prospective juror's attention on the legitimate subject matter at hand, and comfortably moving that juror toward a significant end question. More and more, our jurors serve for one trial or one day, and as a result the voir dire procedure is new to many of them. Answers to complicated and compound questions do not come easily, and a confused or nervous juror, in an environment that some may find threatening, may elect to say nothing if he or she is unsure of the meaning of the question or of the response that would be accurate. Simple, sequential questions, however, ease an otherwise difficult process, and are sometimes best calculated to produce truthful and useful information.

On the other hand, there are many questions that could qualify as potential predicate questions which, when coupled with others, could lead to the development of information relevant to a challenge for cause, and this Court cannot mandate the asking of all such questions. Again, there is no basis upon which to say that preliminary question "A" must be asked, but preliminary question "B" may be refused. The answer, then, lies in the ability of the trial judge to determine

when there is a legitimate desire to explore the existence of cause for disqualification, and when sequential questioning will be beneficial in the pursuit of that inquiry.

It has been my experience that trial judges are quite capable of conducting effective voir dire within acceptable time limitations, and without hamstringing themselves and counsel by allowing only compound questions. Voir dire and jury selection should not be viewed as a nuisance by trial judges. It is an important part of any trial, and the trial judge should have no hesitancy in using the occasion to assist all parties in the search for relevant information.

Likewise, trial judges should not hesitate to restructure unartful questions propounded by counsel when it appears that the information sought would be relevant and the problem with the question is easily rectified. In the instant case, for example, the trial judge might well have asked the panel, in a single question, whether they or any members of their family had ever worked for a law enforcement agency, and as a result of that fact might find it difficult or impossible to render a fair and impartial verdict in the case about to be tried. The benefit of a compound question in that instance is to focus the prospective juror's attention on a specific circumstance that experience has shown is sometimes a disqualifying factor for a juror, without taking the time to hear from each juror about his or her uncle, aunt, or sister who was a police officer. Given the questions that were asked in this case, I agree that the failure to ask that question was not error. The point I make is that trial judges, with their superior experience in hearing responses of all kinds from prospective jurors, should not hesitate to propound reasonable questions, or even to assist with the framing of a proper question, even when it would not be error to refuse to do so.

Additionally, I do not join the Court's opinion because of the dictum which at least implicitly suggests that peremptory challenges are somehow less than desirable. I view peremptory challenges, properly used, as a valuable part of our jury system. Recent decisions designed to prevent impermissible

discrimination in the exercise of peremptory challenges have certainly added a layer of complexity to the process, but that is hardly reason to jettison the entire procedure. I continue to have faith in the ability of attentive trial judges, sensitive to the possibility of unconstitutional misuse of challenges, to separate the wheat from the chaff.

ROBERT M. BELL, Judge, dissenting.

For the reasons set forth below, I respectfully dissent.

During the *voir dire* process, after the trial court had completed its questioning of the venire, the petitioner requested it further to inquire of the panel, whether any member or a close friend or relative, is or has been, a member of the law enforcement community. This question was necessary, he asserted, because, *inter alia*[1], the omnibus questions, which pertained only to the venirepersons' perception of their ability to serve as impartial jurors, and not to any specific area or issue potentially productive of bias, were wholly insufficient; they did not identify any area of potential bias, or any other potential cause for disqualification. The trial court declined the petitioner's invitation to further question the venire. The majority holds, citing judicial efficiency, and, in particular,

---

1. The petitioner also argued that expanded *voir dire* would assist him in the exercise of his peremptories, a purpose he urges this Court now to recognize as legitimate. Maryland law, of course, as the majority points out, is to the contrary. *See Whittemore v. State,* 151 Md. 309, 134 A. 322 (1926); *Handy v. State,* 101 Md. 39, 60 A. 452 (1905). In both cases, the issue squarely presented was whether a defendant "may enlighten [himself] as to the propriety of exercising the right of peremptory challenge." *Handy,* 101 Md. at 40, 60 A. at 453. *See Whittemore,* 151 Md. at 313, 134 A. at 323. I do not propose that we revisit this well considered and legitimate policy decision. I note, however, that, to the extent that proper *voir dire* requires exploration of an area of potential bias, but does not conclusively establish its existence—the court denies the defendant's motion to strike—a fall-out effect of the expanded inquiry is to inform the use of peremptories, not only by a defendant, but by the State, as well. Moreover, that is not necessarily to be frowned upon. Given the disfavor into which the unbridled use of peremptory challenges has fallen, the incidental availability of information which could form the basis for the exercise of peremptory challenges would make more likely that jurors are not stricken for legally impermissible reasons.

raising the specter of greatly expanded and time consuming *voir dire* proceedings in criminal cases, *see* majority opinion at 49–51, that the trial court did not abuse its discretion. I do not agree.

I agree completely with the petitioner, "where 'the sole issue . . . is the credibility of [one] police officer as [o]pposed to [the defendant] a *voir dire* question concerning law enforcement employment or association may well lead to the disqualification for cause of one or more of the prospective jurors.' " [2] Such an inquiry need not be extensive and, indeed, in this case, the inquiry sought to be made by the petitioner can not fairly be characterized as "extensive and unfocus[ed] questioning." I also agree that the trial court's refusal to make the requested inquiry denied the petitioner "the ability to challenge jurors for cause, [and left] the trial judge without

---

2. The question at issue in this case is quite different from those sought to be asked in *Handy* and *Whittemore,* both of which I believe were correctly decided. In *Handy,* the defense wanted to know "whether a juror was married," *id.,* 101 Md. at 44, 60 A. at 454. Quite appropriately, the court held the question to be "clearly immaterial," given the issue to be decided—whether the victim's flirting with other men was sufficient to provoke her murder at the hands of her husband, the defendant. We explained:

"[N]either in law nor in common sense can it be supposed that competency to judge of the effect of such provocation is found exclusively in married men, and if we indulge in speculation as to the reason behind this question, imagination can suggest none more substantial than we have hazarded."

*Id.*

In *Whittemore,* the question concerned the prospective juror's age and former business. In affirming the trial court's refusal to ask that question, the Court said:

The appellant here suggests, by way of illustrating the need of freedom to ask questions as to a juryman's former occupation, that, in this instance, conceivably, he too may have been a former penitentiary guard, and because of that fact unfitted to render an impartial verdict on a charge of murder of a guard by a prisoner. But the answer to that suggestion is that if such ground for doubting a juryman's fitness should be known, *or feared,* a question directed to that ground specifically would *not only be proper,* but in this case would probably have been asked; and if facts showed reason to doubt the juror's fitness to sit in judgment, a challenge for cause might have been allowed.

151 Md. at 314–15, 134 A. at 323–324 (emphasis supplied).

meaningful information concerning juror bias [and prejudices] on which to act, and [shifted] to the prospective jurors themselves the responsibility for making the ultimate decision as to their ability to serve on the jury." The Petitioner's brief at 11, citing *Bowie v. State*, 324 Md. 1, 595 A.2d 448 (1991).

The majority correctly identifies the predominating purpose of the *voir dire* process: the discovery of whether cause for disqualification, which may involve uncovering bias and/or partiality, exists as to any venireperson. Majority opinion at 4–5. This purpose is, of course, served when "examination of a prospective juror . . . is conducted strictly within the right to discover the state of mind of a juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him." *Bedford v. State*, 317 Md. 659, 671, 566 A.2d 111, 117 (1989), quoting *Corens v. State*, 185 Md. 561, 564, 45 A.2d 340, 343 (1946). The majority and I part company only on the question of whether the inquiry sought to be made in this case was for the purpose of ascertaining "the existence of cause for disqualification and for no other purpose." *McGee v. State*, 219 Md. 53, 58, 146 A.2d 194, 196 (1959), quoting *Adams v. State*, 200 Md. 133, 140, 88 A.2d 556, 559 (1952).

Unlike the majority, I do not construe Maryland law as requiring that the *voir dire* inquiry directly establish cause for disqualification. Stated differently, a question on the *voir dire* may be proper even though an affirmative answer is not automatically disqualifying. That is true whenever the question identifies an area of inquiry, exploration of which reasonably may result in ultimate disqualification. Nor do I read Maryland law to mean that the decision whether disqualifying cause exists is a matter to be determined by the venireperson him or herself, rather than the trial court.

In *Bedford*, we reviewed the nature of the *voir dire* examination. 317 Md. at 670, 566 A.2d at 116. We noted the source of the defendant's right in that regard: Art. 21 of the Maryland Declaration of Rights, which guarantees the defendant the right to examine prospective jurors to determine whether cause for disqualification exists. *See also Grogg v. State*, 231

Md. 530, 532, 191 A.2d 435, 436 (1962). We also pointed out that the mechanism by which that right is to be exercised is the *voir dire* process. *Id.*, quoting *Corens,* 185 Md. at 564, 45 A.2d at 343. We reiterated the broad rule underlying the *voir dire* process, that "any circumstances which may reasonably be regarded as rendering a person unfit for jury service may be made the subject of questions and a challenge for cause." *Bedford* 317 Md. at 671, 566 A.2d at 117, quoting *Corens,* 185 Md. at 564, 45 A.2d at 343. Just how broad and important we perceived the right of inquiry to be was made clear when we quoted from *Brown v. State,* 220 Md. 29, 35, 150 A.2d 895, 897–98 (1958 (quoting *State v. Higgs,* 143 Conn. 138, 120 A.2d 152 (1956)):

> If there is any likelihood that some prejudices in the jurors' mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. Otherwise, the right of trial by an impartial jury guaranteed to him ... might well be impaired ...

Thus, it is clear that the defendant may benefit from the benevolent purpose of the *voir dire* only if the *voir dire* process permits the development of information relevant to cause for disqualification—only if the defendant is permitted to propound questions to the venire designed to unearth "any circumstances which may reasonably be regarded as rendering a person unfit for jury service." *Corens,* 185 Md. at 564, 45 A.2d at 343. A *voir dire* procedure which depends on the confession of the venirepersons as to their inability impartially to serve is an empty procedure which might well impair the defendant's right to a fair and impartial jury. Moreover, because the burden is placed on the defendant to demonstrate that a venireperson is biased or partial, the right guaranteed the defendant by Art. 21 of the Maryland Declaration of Rights to examine prospective jurors for cause for disqualification is rendered almost, if not entirely, meaningless by such a procedure.

Under Maryland law it is clear that the focal point of *voir dire* is the trial judge. It is the trial judge that has responsibility for regulating and conducting *voir dire*. It is the trial judge that controls the process; he or she determines: what questions to ask on *voir dire;* whether, and when, to allow counsel to ask follow-up questions; and whether, and when, a prospective juror is dismissed for cause. It follows, therefore, that it is the trial judge that must decide whether, and when, cause for disqualification exists as to any particular venireperson. Neither the venire nor the individual venirepersons occupies such an important position. The position taken by the majority would imbue the venire with much greater power in the determination of the jury composition than the trial judge. Only if a venireperson were to respond in such a fashion as to make obvious that he or she could not serve impartially and fairly could the trial judge, under the majority's view, dismiss that juror for cause, and only under those circumstances could the defendant challenge that venireperson for cause. This renders the defendant's right to challenge for cause unworkable and essentially meaningless.

To be sure, the nature and extent of the *voir dire* process lies within the sound discretion of the trial judge. *Langley v. State,* 281 Md. 337, 341, 378 A.2d 1338, 1340 (1977), quoting *McGee v. State,* 219 Md. 53, 58–59, 146 A.2d 194, 196 (1959). That discretion is not, however, unlimited. *See Casey v. Roman Catholic Archbishop,* 217 Md. 595, 605, 143 A.2d 627, 631 (1958). Indeed, the majority recognizes that this is so. *See* majority opinion at 44. Thus, when it is, or potentially is, in the case, the venire must be questioned as to possible racial bias, *Bowie v. State,* 324 Md. 1, 15, 595 A.2d 448, 455 (1991), religious bias, *Casey,* 217 Md. at 606–07, 143 A.2d at 632, how the venire would weigh the credibility of a police officer's testimony versus that of the defendant or another witness, *Langley,* 281 Md. at 349, 378 A.2d at 1344, and juror attitudes concerning the death penalty, *Bowie,* 324 Md. at 5, 595 A.2d at 450. These are *not the only* circumstances, however, in which the failure of the trial court to further inquire may constitute an abuse of discretion. *See e.g., Alexander v. R.D. Grier &*

*Sons Co. Inc.,* 181 Md. 415, 419, 30 A.2d 757, 758 (1943). In that case, the trial court's refusal to ask "whether or not [jurors] or any of their immediate family [were assessables] in the Keystone Indemnity Exchange," where the issue was the enforcement of an assessment against a subscriber by Keystone, was held to be an abuse of discretion. This Court noted that the question was directed at determining whether any juror was biased or prejudiced: the juror's financial interest "would theoretically incline him in favor of recovery of a verdict for the liquidator." *Id.* at 419, 30 A.2d at 758. *See also Morford v. United States,* 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815 (1950) (where panel from which the jury was selected consisted of almost entirely government employees, refusal to allow questions pertaining to possible influence of the federal loyalty oath was error); *Dennis v. United States,* 339 U.S. 162, 170–172, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950). Similar reasoning unlay *Casey.* Explaining why the trial court's failure to inquire whether anyone in the venire had a religious bias, this Court said

> [I]f the religious affiliation of a juror might reasonably prevent him from arriving at a fair and impartial verdict in a particular case because of the nature of the case the parties are entitled to ferret it out, or preferably have the court discover for them, the existence of bias or prejudice resulting from such affiliation. In other words, a party is entitled to a jury free from all disqualifying bias or prejudice without exception, and not merely a jury free of bias or prejudice of a general or abstract nature."

217 Md. at 607, 143 A.2d at 632.

It is necessary that we focus more critically on the trial court's exercise of discretion. As we have seen, and the majority does not dispute, it is the trial court that is entrusted with making the decision whether cause for disqualification exists. It is that decision to which the court's exercise of discretion is directed and which an appellate court must review. The majority recognizes that in attempting to empanel a fair and impartial jury, the critical inquiry is directed

toward determining the prospective jurors' state of mind, *i.e.,* whether they are biased or prejudiced. Whether a prospective juror has that mindset may be informed by the vocational or professional or social status of the prospective juror.

While professional, vocational, or social status is not dispositive of a venireperson's qualification to serve, it does tend to prove bias; that a venireperson has been, or is, a member of the group to which the principal witness for the State belongs is relevant to the determination of that person's partiality or bias. Thus, the prospective juror's mindset should not be inquired into in a vacuum; instead, because it is the correlation between the juror's status and his or her state of mind that is dispositive, as the majority also recognizes, *see* majority opinion at 46, when the venireperson's status is relevant to his or her bias, the question whether the venireperson can be fair and impartial should be linked with that venireperson's status. Therefore, while "[t]he fact that a prospective juror is employed as, related to, or associated with a law enforcement officer[, for example,] does not establish that the prospective juror has any undue bias or prejudice that will prevent that person from fairly and impartially determining the matter before them," majority opinion at 45, whether, in a particular case, that venireperson should be discharged as biased necessarily will depend upon the circumstances, including, in addition to the venireperson's bottom line conclusion in that regard, as reflected in the answers he or she gives, the character and duration of the position, the venireperson's demeanor, and any and all other relevant circumstances. In short, the trial court, being the proper authority for doing so, will determine from all of the circumstances whether "a demonstrably strong correlation [exists] between the status in question and a mental state that gives rise to cause for disqualification." Majority Opinion at 45.

It was to allow that correlation to be explored that the petitioner proposed further *voir dire.* It is because the trial

court chose not to do so that the trial court erred.[3]

Obviously prospective jurors may be struck for cause whenever they confess, for whatever reason, an inability to be fair and impartial. Indeed, disqualification ordinarily is automatic when that occurs. But surely that is not the only basis on which venirepersons could be stricken. In a proper case, where there is information from which the contrary could be found, a trial court could, on motion, strike for cause a venireperson who professes to be able to decide the case fairly and impartially. Thus, whatever the prospective juror's response to the ultimate *voir dire* question, a prospective juror may, and should be, subject to challenge for cause. *See*

---

**3.** It may be that a motion to strike for cause may be appropriate even when the only available information is that the venireperson is, or is related to, a police officer. *See Tate v. People*, 125 Colo. 527, 247 P.2d 665 (1952) (constitutional guarantee that law enforcement personnel are not qualified to sit as jurors precluded a special deputy sheriff from appearing as a witness at the defendant's trial for the murder of her former husband, it being presumed that deputy would clearly show allegiance to his superior who was the sheriff and the prosecutor); *Gaff v. State*, 155 Ind. 277, 58 N.E. 74 (1900) (deputy sheriff constitutionally cannot serve on a jury); *State v. Butts*, 349 Mo. 213, 159 S.W.2d 790 (1942) (it was error for the trial judge to overrule defendant's challenge for cause against a police officer who had investigated the crime and subsequently arrested the defendant. The court said "It seems incompatible with justice that a defendant who has been apprehended by the police, and against whom the police officers were going to testify should be tried by a jury made up of police officers.") *State v. Golubski*, 45 S.W.2d 873 (Mo.1932) (State statute exempting deputy sheriff's from jury service is legislative recognition of the impropriety of officers acting as jurors in cases wherein they might be called upon to perform other and inconsistent duties); *State v. Langley*, 342 Mo. 447, 116 S.W.2d 38 (Mo.1938) (defendant's statutory rape conviction was reversed where the State constitution guaranteed the defendant the right to an impartial jury thereby disqualifying a law enforcement officer from sitting on the jury panel); *Thompson v. State*, 541 P.2d 1328 (Okla.1975) (law enforcement personnel cannot sit as jurors where statutes specifically disqualify them from jury service); *State v. West*, 157 W.Va. 209, 200 S.E.2d 859 (1973) (a defendant's challenge for cause should be sustained when he can demonstrate even a tenuous relationship between the prospective juror and any law enforcement or prosecutorial arm of State government). In this case, because the court did not ask the proffered question, the petitioner was not afforded an opportunity to move to strike for cause any prospective juror with a connection to law enforcement.

*Wainwright v. Witt,* 469 U.S. 412, 429, 105 S.Ct. 844, 855, 83 L.Ed.2d 841, 855 (1985), in which the Supreme Court discussed the nature of the trial court's decision-making when it determines whether to exclude a venireperson for cause. It stated, "[t]he trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be discerned from an appellate record." Although *Witt* was a capital sentencing case, the Court noted explicitly that "excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias...." *Id.*

Thus, the strike for cause process encompasses the situation where the motion to strike is made on the basis of information developed during the *voir dire* process, not simply where the prospective juror admits an inability to be fair and impartial. In point of fact, I maintain that the *voir dire* process is meaningful only when it is expansive enough to allow a party—be it the State or the defense—to elicit factual information which could form the predicate for a challenge for cause. Unless the *voir dire* process is interpreted as requiring the trial judge to ask questions that will produce such factual information as may be relevant to the venireperson's bias, the *voir dire* process will be rendered all but entirely useless. When the inquiries that constitute proper *voir dire* are restrictively interpreted, so that the *voir dire* process does not produce any information other than that which is automatically disqualifying, the defendant may be deprived of the right to a fair and impartial jury; he or she is completely at the mercy of the good faith, objectivity, and astuteness of the individual venirepersons. I believe that it is an abuse of discretion for the court to so restrict the *voir dire* process.

Under the rationale underlying the majority's view of *voir dire,* taken to its logical conclusion, all that would be necessary to empanel a legally sufficient jury is that the trial court ask the prospective jurors whether they could be fair and impartial. Only those jurors who confessed that they could not

would, or could, be challenged for cause. Because the *voir dire* has not produced any other information, the others would be absolutely insulated from challenge. The majority's recognition that, by virtue of our prior holdings and the Supreme Court's insistence, more than one omnibus question must be asked is not particularly comforting. By requiring that the connection between the cause for disqualification and the answer to the *voir dire* inquiry be direct, the majority greatly reduces the value of even those required inquiries and, indeed, all but nullifies their value in obtaining information useful as a basis for challenging venirepersons for cause.

The jury selection process in capital cases is instructive. In *Bowie*, we considered the adequacy of a *voir dire* examination into juror attitudes concerning the death penalty. The entire *voir dire* examination on that issue consisted of the following:

> Ladies and gentlemen, the State of Maryland has filed a request before the court that if found guilty, Mr. Damon Bowie will be put to death. Is there any member of the prospective jury panel who has any feeling whatsoever about such a request, and I don't care which way you feel about it, that it would interfere with your ability to fairly and truly judge this matter based only on the evidence before the court?

> Said another way, is there anybody in this room who has such feelings about the death penalty one way or the other way that it would affect you emotionally or to the extent that it would override your ability to judge this matter based only on the evidence brought out in the courtroom and the instructions of the court to you and the application of that evidence to the law? If you have a positive response, please stand in place.

324 Md. at 16, 595 A.2d at 455. Jurors who responded affirmatively were excused for cause. *Id.* The court overruled defendant's objection to that procedure.

This Court reversed. After reviewing the decisions in *Witt, supra; Grandison v. State,* 305 Md. 685, 506 A.2d 580, *cert.*

*denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986); and *Hunt v. State,* 321 Md. 387, 583 A.2d 218 (1990), we explained:

What occurred in the instant case is in no way similar to what occurred in *Witt* or in our cases applying *Witt.* In those cases, the basis for the juror's conclusion and, therefore, for the court's ruling was apparent in the record. All we have in this case is a trial judge's propounding of a question designed to elicit from prospective jurors *their* bottom line conclusion as to their ability to serve on a capital sentencing jury. Once the prospective juror answered that question, *i.e.,* indicated that, because of an inclination for or against the death penalty, they could not impartially apply the law in accordance with the court's instruction, they were excluded without further inquiry, not even that requested by appellant, because it would have allowed the parties to "argue them out of their responses that they cannot fairly and accurately try this case."

It is significant that the question asked was extremely broad; not only did it address both sides of the death penalty issue, but the answer to it did not provide any clue as to what caused, or causes, the prospective juror's predisposition. Moreover, the answer to the question did not reveal whether the attitude thus expressed would, or should, result in automatic disqualification. In other words, the mere answer to the question does not provide the trial judge with any meaningful information concerning juror bias on which to act, nor does it conclusively establish juror disqualification; here, the question gives no clue and, hence, does not make apparent the nature of the juror's apprehension or bias or indicate that automatic disqualification would be appropriate. Were we to endorse the procedure followed in this case, we would be ratifying a trial court's shifting to the prospective jurors, themselves, the responsibility to make the ultimate decision as to their ability to serve on a capital sentencing jury, thus, allowing the court to avoid the exercise of discretion.

*Bowie,* 324 Md. at 22–23, 595 A.2d at 459.[4]

In *Bowie,* the jurors' attitude for or against the death penalty was not automatically disqualifying, *See Witt,* 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851–52; *Hunt v. State,* 321 Md. at 415, 583 A.2d at 231, just as the questions as to the venire's status are not disqualifying. Disqualification could occur only after further inquiry into whether that juror's attitude, whether for or against the death penalty, impaired his or her ability impartially and fairly to decide the case. It is significant that we required a more specific inquiry than that made by the trial court. Implicit in the *Bowie* decision is that, whether for or against the death penalty, the juror's attitude in that regard is an important factor to be considered by the court when ruling on a motion to strike a death penalty juror for cause.

The *voir dire* actually conducted in this case is also informative. The trial court asked six questions on *voir dire.* Of the six, an affirmative answer to only one, namely,

"4) ... whether any of the jurors is "likely to give more or less weight to the testimony of a police officer merely because that person is a police officer,"

*Davis v. State,* 93 Md.App. 89, 92, 611 A.2d 1008, 1009 (1992), which directed, and focused, the venire's attention to a specific, relevant issue in the case, was automatically disqualifying. As to the other five questions, *i.e.,*

1) ... whether any of the prospective jurors had any knowledge or information about this particular case[;]

---

4. We said in *Bowie v. State,* 324 Md. 1, 24, n. 10, 595 A.2d 448, 459 n. 10 (1991), that a different situation applies in non-capital cases. That may be true when the prospective juror's attention is focused by reference to a specific disqualifying cause, *i.e.,* as when the inquiry is whether a juror would give more or less weight to a police officer simply because of his or her status. On the other hand, the question whether the "juror" knows of any reason why he or she should not sit on the jury in this case and whether he or she "knows of anything that would keep him or her from giving a fair and impartial verdict in this case" are not proper bottom line conclusion questions inasmuch as they, like the question at issue in *Bowie,* leaves to the juror, and only the juror, the decision whether he or she is disqualified.

2) ... whether any of the jurors knew a) the [defendant], b) defense counsel, c) the assistant state's attorney, d) Officer Andrew Bratcher, the chief police investigator and only State's witness; or e) Mary Easlay, a witness for the defense[;]

3) ... whether any of the jurors "has been or ... has a close relative who has either been the victim of or has been charged with or convicted of a drug related crime[;]"

5) ... whether any of the jurors "knows of anything that would keep him or her from giving a fair and impartial verdict in this case[;]"

6) ... whether any of the jurors "knows of any reason why he or she should not sit on a jury in this case[,]"

*Davis v. State,* 93 Md.App. at 92, 611 A.2d at 1009, an affirmative answer would not be automatically disqualifying. Each merely opened up an area of inquiry which *could, but did not have to, disclose* disqualifying bias. A prospective juror who has knowledge of the case on trial, knows either the counsel or the witnesses; is, has been, or is related to a person who has been, the victim of a crime, or knows of anything that would prevent him or her from rendering a fair and impartial verdict, or a reason why he or she should not sit in the case, is not automatically disqualified from serving on the jury. The venireperson's answer triggers, as occurred in connection with questions 2) and 3), a further inquiry into whether that knowledge would prejudice or bias him or her. To be meaningful the inquiry must, at the very least, identify, as to each prospective juror, the nature and source of the knowledge and its effect on his or her ability to be fair and impartial. The fact that, upon the completion of the inquiry, a prospective juror does not admit bias does not insulate him or her from being discharged for cause; a successful motion nevertheless could be made based on the prospective juror's responses and demeanor.

Questions 5) and 6) are somewhat different. Initially, it is to be hoped that a Court would not, without further inquiry, excuse a prospective juror who answers these questions in the

affirmative; follow-up questioning is clearly necessary to establish the *bona fides* of the reasons the prospective jurors may proffer, a decision entrusted to the court. More to the point, however, those questions are quite general and uninformative insofar as what kinds of considerations could impact a response; they are no more than "broad questions calling for the jurors' bottom line conclusions, which do not in themselves reveal automatically disqualifying biases as to their ability fairly and accurately to decide the case, and, indeed, which do not elucidate the bases for those conclusions." *Bowie,* 324 Md. at 23–24, 595 A.2d at 459. It is improper to assume that the venirepersons could, and, therefore, simply to rely on them to, answer such questions objectively and accurately.

Although not identical, in the case *sub judice,* a prospective juror's belief as to whether, given his or her law enforcement background or connection, he or she cannot fairly and impartially decide the case is not conclusive as to that juror's qualification to serve. While it may be that the defendant will challenge, and the court will order, the discharge of all those prospective jurors who say that they cannot be impartial, the defendant is also entitled to explore whether those with a law enforcement connection or background, who, by their silence, purport to be able to be fair and impartial, ought, nevertheless, be disqualified by reason of bias. So, it is to allow the defendant to challenge for cause prospective jurors who do not admit partiality or bias that prompts a defendant to request that questions pertaining to the jurors' status be asked.

I do not advocate unlimited *voir dire* of the kind against which the majority makes such a compelling case. My position simply is that a prospective juror's status or attitude must be the subject of the *voir dire* examination when a critical witness in the case occupies that status or has that attitude. In that event, the purpose of the *voir dire* examination is to identify the prospective jurors with that status or attitude. This may be accomplished by expanding the scope of the *voir dire* somewhat; rather than the six questions the trial judge asked in this case, it may be necessary to ask an additional

two or three. Certainly, that is not too high a price to pay to give meaning to a right guaranteed by our Constitution.

I would reverse and remand for new trial.[5]

ELDRIDGE, J. joins in the views expressed herein.

---

**5.** By stressing that it would not have been error had the court asked the subject question, like Judge McAuliffe, the majority seems to be sending a message to trial judges that they should not curtail *voir dire* too strictly, thus muting the impact of its ruling. Implicitly therefore, the majority recognizes that the inquiry is not totally irrelevant to the exercise of the right to challenge for cause. In any event, this same message has been delivered to trial judges in the past. In fact, in both *Handy* and *Whittemore,* the Court noted the trial court's discretion to have asked the excluded question. *See Handy,* 101 Md. at 42–43, 60 A. at 454; *Whittemore,* 151 Md. at 313, 134 A. at 323. Nevertheless, *voir dire* continues to be limited more and more. There is no reason to suppose that "the message" will have any greater effect this time in causing trial judges to exercise their discretion more expansively than it has had in the past.