920 A.2d 1137

**Bruce C. BEREANO**

v.

**STATE ETHICS COMMISSION.**

**No. 2412, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

April 12, 2007.

Timothy F. Maloney (Cary J. Hansel, Brian J. Markovitz, on brief), Greenbelt, for appellant.

Steven M. Sullivan (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel ADKINS, SHARER, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

KENNEY, J.

Bruce C. Bereano appeals the judgment of the Circuit Court for Howard County, affirming the finding of the State Ethics Commission (the "Commission") that Bereano knowingly and willingly violated Maryland Code (1984, 2004 Repl.Vol.), § 15–713(1) of the State Government Article ("S.G.") by being engaged for lobbying purposes for compensation that was contingent upon executive or legislative action. Premised upon its finding that Bereano knowingly and willfully violated S.G. § 15–713(1), the Commission, acting pursuant to its newly conferred authority under S.G. § 15–405(e), reprimanded Bereano, suspended his lobbying registrations for a period of ten

months, prohibited him from engaging in lobbying activity for ten months, imposed a $5,000 fine, and required him to submit to the Commission for a period of three years copies of all fee agreements for lobbying activity.

Bereano presents four questions for our review, which we have slightly reworded as follows:

I. Was the Commission's decision that Bereano knowingly and willfully violated S.G. § 15–713 supported by substantial evidence on the record?

II. In sanctioning Bereano for his violations of S.G. § 15–713(1), did the Commission apply S.G. § 15–405 retroactively?

III. Did the Commission err in applying the "missing witness rule" and in concluding that a witness Bereano did not call to testify before the Commission would not have supported Bereano's testimony?

IV. Does S.G. § 15–713(1), which prohibits registered lobbyists from engaging in lobbying activity for compensation that is contingent upon legislative and executive action, constitute an unconstitutional restraint on free speech or the right to petition the government for redress of grievances in violation of the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights?

For the following reasons, we shall affirm the judgment of the circuit court.[1]

---

1. Subsequent to filing of the opinion in this case on November 9, 2006, appellant filed a Motion for Reconsideration to Court Panel or in the Alternative Request for En Banc Hearing.

Essentially, the reconsideration motion raised three general arguments regarding the Commission's application of the missing witness rule in this case: (1) that appellant was denied fundamental due process because he did not receive prior notice of the application of the missing witness rule; (2) that the missing witness rule should not apply to administrative agency proceedings in general because the strict rules of evidence do not apply and to the Commission's proceedings in particular because the staff counsel had the obligation to submit "all available evidence" to the Commission; and (3) that Traina was equally

## FACTUAL AND PROCEDURAL HISTORY

Chapter 15, Subtitle 7 of the State Government Article regulates lobbying activity. Section 15–713 of that Article, which was enacted by the 631st Act of the 2001 Session and became effective on November 1, 2001,[2] prohibits activities of regulated lobbyists. It provides, in pertinent part:

A regulated lobbyist may not:

(1) be engaged for lobbying purposes for compensation that is dependent in any manner on:

(i) the enactment or defeat of legislation;

(ii) the outcome of any executive action relating to the solicitation or securing of a procurement contract; or

(iii) any other contingency related to executive action or legislative action.

Bereano, formerly an administrative assistant and legal counsel to the Office of the Senate President, has been a

---

available to both parties and not within the "peculiar control" of appellant.

The arguments developed in appellant's brief and reply brief regarding the missing witness rule are directed to the equal availability of Traina to both parties. The argument that the missing witness rule should not be applied in administrative agency proceedings generally, and in a Commission proceeding in particular, was not raised. The only statement that might suggest the due process notice argument developed in the reconsideration motion is the statement in appellant's reply brief that, "[w]ithout asking Bercano why Traina did not testify, the Commission found that his non appearance violated the missing witness rule." Reply brief at 2.

As to appellant's continuing violation argument, it is essentially the same as the argument previously considered by the Court. Appellant's motion is denied.

2. Prior to November 1, 2001, the prohibitions on regulated lobbyists were established by Maryland Code (1984, 1999 Repl.Vol.), § 5–706 of the State Government Article, which provided:

A regulated lobbyist may not be engaged for lobbying purposes for compensation that is dependent in any manner on:

(1) (i) the enactment or defeat of legislation; or

(ii) any other contingency related to legislative action; or

(2)(i) the outcome of any executive action relating to the solicitation or securing of a procurement contract; or

(ii) any other contingency related to executive action.

lobbyist registered with the Commission since its creation in 1979. In September 2001, he contracted with Michael Traina, founder of the Mercer Group, Inc., parent company of Social Work Associates, Inc. (collectively "Mercer"), to provide lobbying, political consulting, and contract development services.

In a letter dated September 1, 2001, Bereano proposed a fee agreement for his services, the terms of which were accepted by Mercer on September 13, 2001 (the "Fee Agreement"). The Fee Agreement provided, in pertinent part:

Following up our discussions, I write this letter to present a fee proposal to you concerning your new business venture, Mercer Venture, Inc., d/b/a Social Work Associates, Inc. (hereafter referred to as Mercer Ventures). I propose to represent Mercer Ventures in the State of Maryland in a lobbying, political consulting, and strategy development capacity relative to the Company's plans to develop and obtain contracts and arrangements with various county, municipal, and State government agencies and departments in order to provide and perform on a privatized basis staffing agencies and case management functions. In addition, I would be willing and able to assist your company with any business development and activities in other states and jurisdictions outside of Maryland.

I propose commencing the month of September 1, 2001, a monthly retainer fee of $2,000.00 plus reimbursement for any necessary and reasonable expenses such as postage, duplicating costs, long distance telephone calls, mileage, fax expense, and legislative meals and entertainment. Any significant or unusual expenses would have to be approved and authorized by you before being incurred. These fees and expenses would be paid and continue on a regular basis once your company attains a financial cash flow, and ability to do so.

The nature and scope of my services for the monthly retainer would include and encompass performing lobbying services, giving advice, consultation, strategy and be a resource concerning legislative and political and government matters at both the State and local levels, attending and

participating in all necessary and required meetings, monitoring and watchdogging on behalf of the Company, and providing information to your companies as to matters of concern and importance with its work and relationships with the State of Maryland, as well as any political subdivision in the State and generally performing any and all other such similar and related services and activities as you may request of me. In this regard, I also would register as a lobbyist and fully comply and conform with the State's applicable law.

It is further understood and agreed that in addition to and separate and apart from payment of the aforementioned monthly fee retainer fee and any further increase thereof, Mercer Ventures will compensate me one percent (1%) of the first year receivable for continuing representation and services be *[sic]* performed, provided, and made available when and after each separate facility and/or site or location that is opened in which I was involved in securing and participated in obtaining, and/or any contract and performance of services which is entered into by your company with any government entity, unit or agency in the State of Maryland or any other state or jurisdiction in which I worked on the matter.

As to and concerning any private contracts and business which I assist and help on obtaining for your company it is understood and agreed upon that separate from and in addition to any monthly fee arrangement as set forth herein I also will receive and be paid a monthly agreed upon bonus and reward for such private contract or business.

It is understood that this relationship and fee arrangement can be renegotiated and changed at any time by mutual agreement of the parties as they develop and experience this work relationship, and that except for the provision and understanding herein to compensate me when and after any contract is entered into a government unit, Mercer Ventures can terminate the same monthly fee relationship at the Company's discretion at any time after giving thirty days prior written notice.

On November 13, 2001, Bereano filed a lobbying registration form with the Commission, declaring, under oath, his intention to perform executive and legislative action lobbying on behalf of Social Work Associates, a subsidiary of Mercer. Bereano indicated that the effective date for lobbying on behalf of Social Work Associates for "any and all legislative and executive matters concerning staffing and case management foster care, children and social services issues" was November 1, 2001 to October 31, 2002.

Later, on December 1, 2001, Bereano sent an invoice to Mercer requesting a $2,000 retainer for the months of September, October, November, and December. He also requested payment for expenses that included long distance phone calls, mileage, duplicating, and $393.34 in "Legislative Meals [and] Expenses." Again, in an invoice dated January 16, 2002, Bereano requested payment in the amount of $24,000 for "professional [s]ervices [r]endered," and a $2,000 retainer for January. He also sought reimbursement for expenses, including $454.39 in "legislative meals and expenses." Bereano sent similar invoices to Mercer billing for his monthly retainer fee and seeking reimbursement of "legislative expenses," meals and entertainment, mileage, duplicating, and long distance telephone calls on February 6, 2002, March 1, 2002, April 1, 2002, May 1, 2002, and June 1, 2002.

Traina sent Bereano a letter dated May 17, 2002, detailing Mercer's recent projects. The letter was accompanied by an "Organizational Capability" statement, listing among Mercer's "major clients" the following State Agencies: the Department of Public Safety and Correctional Services; the Department of Assessments and Taxation; the Department of Health and Mental Hygiene; the Department of Business and Economic Development; and the Department of Human Resources.

Approximately one month later, in a letter dated June 12, 2002, Traina stated the following with regard to the Fee Agreement:

Following our recent conversation, I understand someone from the *Baltimore Sun* has reviewed our letter agreement

from September 2001 and has misinterpreted part of the letter stating that he believes that it contains a "contingency agreement." As you and I are aware, the intention of any portion of the fee agreement was not a contingency fee, but instead additional compensation for ongoing services that we were going to budget at 1%.

Clearly, this was not a contingency arrangement because you were to be paid additional compensation for additional services that would be required under any new contract. You would not have been paid if you did not provide additional services. You would not have been paid for winning the contract.

Despite the misinterpretation by the *Baltimore Sun*, I think it would be prudent to amend our contract to ensure that the contract isn't misinterpreted in the future and to be sure that it is in compliance with all Maryland State Regulations. I would like to replace the entire paragraph in which the language "1% of the first year receivable for continuing representation and services to be performed, provided and made available" is mentioned to instead include the following "[f]rom time to time, Mr. Bereano's compensation will be reviewed and adjusted based on the size of the company at the time and scope of services required by Mr. Bereano."

I would also appreciate if you would correct the apparent error regarding compensation received from Mercer Ventures, Inc., which was reported to the State Ethics Commission.[3]

I think it is a good time to amend this contract in that we have not successfully bid on any government contracts and the alleged "contingent fee agreement" discussed herein was never utilized.

After receiving Traina's June 12 letter, the language providing Bereano with one percent of first year receivables for "any

---

3. In a lobbying activity report filed May 31, 2002, Bereano reported total compensation from Social Work Associates in the amount of $138,000. On June 13, 2002, he filed an amended report stating that he had been compensated $16,000.

contract and performance of services" entered into by Mercer "with any government entity, unit, or agency" secured by Bereano, or for which he worked, was removed from the Fee Agreement.

Subsequently, on June 13, 2002 and December 2, 2002, Bereano filed General Lobbying Activity Reports indicating that he had performed lobbying activities on behalf of Social Work Associates from November 1, 2001 to October 31, 2002, and had received $26,000 in total compensation. He also reported that he had expended $200 in "gifts to officials."

### The Ethics Complaint and Commission Action

The Commission initiated a complaint against Bereano on September 19, 2002, alleging that he had entered into three contracts, including the Fee Agreement, which constituted engagements for lobbying services for compensation that was contingent upon some legislative or executive action in violation of S.G. § 15–713(1). Following a preliminary hearing by the Commission and several continuances, a hearing on the merits commenced on June 25, 2003.

At the hearing, Bereano testified that, having drafted the initial legislation that prohibited lobbying for contingency fees while serving in the office of the Senate President, he was "well aware" that contingency fee arrangements were prohibited in Maryland. According to Bereano, he drafted the Fee Agreement with Mercer, but the language regarding the additional fee for one percent of first year receivables was included at Traina's request. He did not intend to create a contingency fee and did not know of Mercer's contracts with State agencies or its intentions to procure contracts with State agencies. Bereano stated:

> The intent of this document[,] [the Fee Agreement,] and the drafting of this document was in compensation for continuing work and it was phrased by saying continuing representation and services to be performed. That is a condition precedent and a continuing condition to the receipt of additional compensation, which, respectfully, in the draft-

ing of this I did not consider to be a contingency arrangement.

With regard to the modification and termination provisions in the Fee Agreement that provided that the agreement could be modified except for Mercer's agreement to compensate Bereano "when and after" "any contract and performance of services . . . is entered into" by Mercer "with any government entity, unit, or agency in the State of Maryland or any other state jurisdiction," Bereano claimed that that provision merely evidenced that the intent of the Fee Agreement was not limited to lobbying Maryland State agencies, but was intended to cover lobbying activities before county and municipal governments, as well as governments outside Maryland.

Despite the language of the Fee Agreement, his registration with the Commission, and his filing several lobbying activity reports, Bereano claimed not to have performed any lobbying activities on behalf of either Mercer or Social Work Associates. When asked about the invoices he sent to Mercer requesting payment for mileage, phone calls, and legislative meals and expenses, Bereano stated that the expenses related to social events attended by himself and Traina, after which Bereano would "pick up not only [his] meal but [Traina's] meal." Through the invoices, Bereano sought reimbursement from Traina. Bereano asserted that, even though he had not lobbied for Mercer or Social Work Associates, he registered with the Commission and filed lobbying activity reports "out of an abundance of caution." When questioned about the disclosure on a General Lobbying Activity Report that he had given $200 in "gifts for officials," he could not explain it.

Neither the Commission nor Bereano called Traina to testify at the hearing. At the conclusion of the Commission's case, Bereano moved for judgment, which the Commission granted on two of the counts in the complaint relating to clients and contracts other than Mercer and the Fee Agreement. The sole remaining issue was whether, under the Fee Agreement, Bereano was engaged for lobbying activity for compensation

that was contingent upon the outcome of legislative or executive action in violation of S.G. § 5–713(1).

On June 30, 2003, the Commission issued its final decision and order, in which it concluded that Bereano had knowingly and willfully violated S.G. § 15–713(1). It determined that the "clear and unambiguous language of the [Fee][A]greement clearly contemplated the lobbying of various State government agencies and departments." The Commission acknowledged that Bereano testified that

> he was unaware that Mercer . . . had any public contracts at the time the [F]ee [A]greement was entered in September 2001; that he did not learn of the contracts with State agencies until he received a letter from Mr. Traina in May 2002; that the language in the [F]ee [A]greement related to "1% of the first year receivables" was added to the agreement at Mr. Traina's request and Mr. Traina sent the language to him for that clause; and that he advised Mr. Traina that contingency fees are illegal under State law; that the agreement was intended to address private business activities; that all his activities were in the private sector and that he had no activities involving State officials on behalf of Mr. Traina; that he has had no lobbying activity; that he did not give any gifts to officials on behalf of Mercer . . .; that he did not lobby or even monitor legislation during the 2002 session on behalf of Mercer . . .; that he only registered as a regulated lobbyist out of an "abundance of caution;" and that he kept detailed time records for each client.

The Commission, however, found his testimony "less than credible and incongruous with the plain language of the documents submitted into evidence," many of which Bereano filed with the Commission attesting to their correctness and truthfulness under oath.

The Commission commented that, under the Fee Agreement, Mercer was "hir[ing] [Bereano] to obtain State contracts in Maryland and his testimony that it was not until nine months after the [F]ee [A]greement that he became aware

that Mr. Traina had some existing contracts with State agencies, is not credible." Furthermore, the Commission took exception to Bereano's contention "that he did 'nothing at the State level[,]' " observing that he registered as a lobbyist for Mercer on November 13, 2001, for the period of November 1, 2001 through October 31, 2002. Bereano also filed a General Lobbying Activity Report on June 12, 2002, disclosing, under oath, "all legislative and executive matters concerning staffing and case management, and social service issues." In that report, Bereano claimed to have made $200 in "gifts to or for officials or employees or their immediate families," which, at the hearing, he denied doing, but could not explain.

In addition, the Commission noted that Bereano submitted invoices to Traina seeking reimbursement for "legislative expenses" and "legislative expenses and meals." Although he professed to have maintained detailed records for each of his clients, Bereano did not produce documentation to explain the invoices or lobbying activity reports. Because Bereano insisted that the language regarding compensation of one percent of first year receivables was added to the Fee Agreement at Traina's request and Bereano did not call Traina to testify, the Commission inferred that Traina's "testimony would not have supported [Bereano's.]"

According to the Commission, the fact that Bereano may not have actually secured contracts for Mercer or have been compensated pursuant to the terms of the contingency clause of the Fee Agreement was "irrelevant" because S.G. § 15–713(1) proscribes a registered lobbyist from "being engaged for lobbying purposes" for compensation that is contingent upon legislative or executive action. Bereano had registered as a lobbyist on behalf of Mercer and billed for "legislative expenses" under a contract, the "unambiguous" language of which provided for compensation of one percent of all first year receivables for each facility, location, or contract Bereano was "involved in securing" for Mercer "with any government entity, unit or agency in the State of Maryland." Therefore, the Commission found Bereano in violation of S.G. § 15–713(1)(ii).

Acting under S.G. § 15–405(d) and (e), the Commission exercised its authority to suspend or revoke the registration of a "registered lobbyist" who "knowingly and willfully violated Subtitle 7" of the Ethics Law. Because Bereano did not register with the Commission on behalf of Mercer until November 13, 2001, after the November 1, 2001 effective date of S.G. § 15–713, the Commission concluded that it was not applying S.G. § 15–405 retroactively. It also noted that Bereano remained registered as a lobbyist for Mercer with the Fee Agreement governing his compensation until June 12, 2002.

Interpreting the "knowin[g] and willfu[l]" language of S.G. 15–405(e), the Commission determined that the "civil definition" of "willfully" was applicable, and under that definition a person was found to act "willfully" where his or her " 'act is intentional, or knowing, or voluntary, as distinguished from accidental.' " (quoting *Pacific Mortgage & Investment Group, Ltd. v. Horn*, 100 Md.App. 311, 641 A.2d 913 (1994)). The Commission interpreted "knowing" and "knowingly" as " '(1) having or showing awareness or understanding; well informed (a knowing waiver of the right to counsel)[;][and] (2) deliberate; conscious.' " (quoting Black's Law Dictionary 872 (7th ed.1999)). Applying those definitions to its factual findings, the Commission determined that Bereano could not be said to have "accidentally" entered into the Fee Agreement because he was admittedly "well aware" of the prohibition against contingency fees, was responsible for drafting the Fee Agreement, and intentionally included the language creating a contingency fee.

The Commission concluded that, "based on the violation, the lack of credibility of [Bereano], and [his] long history as a lobbyist that a suspension and fine are in the public interest and necessary to protect the integrity of the governmental process." Through its order, the Commission suspended Bereano's lobbying registrations for ten months, prohibited him from engaging in lobbying activities for a ten month period, reprimanded him, and fined him $5,000. The Commission also ordered Bereano to submit all fee agreements for lobbying

activity before the legislative and executive branches of the State government following the expiration of the ten month suspension for a period of three years.

Bereano petitioned the Circuit Court for Howard County for judicial review, and the circuit court affirmed the Commission's decision on December 28, 2004. This timely appeal followed.

## STANDARD OF REVIEW

We review the decision of the agency, not the decision of the circuit court. *Abbey v. Univ. of Maryland,* 126 Md.App. 46, 53, 727 A.2d 406 (1999). In reviewing an administrative agency's decision, we are " 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 67–68, 729 A.2d 376 (1999) (quoting *United Parcel Serv. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994)). In other words, we must decide " ' "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." ' " *Banks,* 354 Md. at 68, 729 A.2d 376 (quoting *Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 512, 390 A.2d 1119 (1978)).

We review an agency's decision in the light most favorable to it under the assumption that its decision is *prima facie* correct and presumptively valid. *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169 (2001). We recognize that " 'it is the agency's province to resolve conflicting evidence' and to draw inferences from that evidence." *CBS, Inc. v. Comptroller of Treasury,* 319 Md. 687, 698, 575 A.2d 324 (1990) (quoting *Ramsay, Scarlett & Co. v. Comptroller of Treasury,* 302 Md. 825, 834–35, 490 A.2d 1296 (1985)). Moreover, we "will review an adjudicatory agency decision solely on the grounds relied upon by the agency." *Department of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 123, 771 A.2d 1051 (2001). *See also Brodie v. MVA,* 367 Md. 1, 4, 785 A.2d 747 (2001)

(affirming case for the reasons set forth by the agency and declining to address a question not raised before the agency).

When reviewing the agency's legal conclusions, we " 'must determine whether the agency interpreted and applied the correct principles of law governing the case and no deference is given to a decision based solely on an error of law.' " *Eastern Outdoor Adver. Co. v. Mayor & City Council of Baltimore,* 128 Md.App. 494, 514, 739 A.2d 854 (quoting *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md. App. 607, 652, 701 A.2d 879 (1997)). We do, however, give deference to an agency's interpretation of its own rules and regulations, and we give the agency's interpretation and application of a statute it administers considerable weight. *Maryland Div. of Labor & Indus. v. Triangle Gen. Contractors, Inc.,* 366 Md. 407, 416, 784 A.2d 534 (2001).

## DISCUSSION

### I.

Bereano presents a series of alternative arguments premised on his contention that there was insufficient evidence to support the Commission's finding that he knowingly and willfully violated S.G. § 15–713(1). First, he argues that, because he "did not communicate with or set up meetings with officials of the Legislative or Executive Branch on behalf of Mercer, his activities fail to satisfy the requirements of [S.G.] § 15–701." Therefore, he was not required to have registered as a regulated lobbyist for Mercer and was not required to file lobbying activity reports. In other words, because he performed no lobbying activity, he was not a "regulated lobbyist" and could not have been in violation of S.G. § 15–713(1).

Secondly, he argues that the Fee Agreement contained "separate and distinct" contracts. Under the "Monthly Retainer Provisions," included in the second and third paragraphs of the Fee Agreement, Bereano was to "be a resource concerning legislative and political and government matters at both the State and local levels." If, as a result of receiving

the $2,000 retainer from Mercer for performing his obligations under the "Monthly Retainer Provisions," he was "required" to register as a lobbyist pursuant to S.G. § 15–701 and file lobbying activity reports, "nothing in the Monthly Retainer Provisions of the [Fee Agreement] or in the record below . . . provided Bereano should solicit or secure from the executive branch of the Maryland State government any procurement contract-either a specific contract or executive procurement generally." "Therefore, the lobbying registration statements, the lobbying billing and lobbying activity report arise only from the receipt of the fee provided for in the Monthly Retainer Provisions, and are irrelevant and have nothing to do with the allegation of lobbying to procure or solicit 'a [S]tate contract.' "

As to the Commission's reliance upon the billing statements and lobbying activity report in finding that Bereano, while a regulated lobbyist, was engaged for lobbying purposes for compensation contingent upon legislative or executive action, he argues:

> The fact that [he] reported legislative activity (and not executive branch activity at all) under the broad range of lobbying categories contained in [S.G.] § 15–701 is not evidence that he violated [the] [S.G.] § 15–713 prohibition against being engaged for the outcome of executive branch procurement, any more than it is evidence that Bereano engaged in any of the myriad activities authorized in the Mercer Agreement. The lobbying activity statements and billing statements confirm this and make no reference of any solicitation or procurement of an executive branch contract, or any contingency fee activity.

With regard to the remainder of the Fee Agreement, which provided for compensation of one percent of the first year receivables of any facilities, locations, or contracts with governmental entities, units, or agencies in the State of Maryland secured by Bereano, he maintains that he only attempted to obtain "private sector contracts for Mercer" and "set up no meetings for Traina with any state or government agency." He asserts that there was no evidence that he lobbied to

obtain procurement contracts or that he was compensated for securing a procurement contract for Mercer.

Bereano also claims that the Fee Agreement was a broad contract intended to cover numerous jurisdictions, including lobbying in jurisdictions where lobbying for a contingency fee would not be an ethical violation.

We conclude that the legislative intent of S.G. § 15–713(1) proscribes the *contracting* for lobbying services by regulated lobbyists for compensation contingent upon legislative or executive action. Therefore, violation of the statute is not dependent upon the actual performance of lobbying or other services under the contract. As we shall explain, it is being "engaged for," rather than being "engaged in," lobbying for a contingency fee that is precluded by S.G. § 15–713(1).

The Court of Appeals "has stated many times 'that the cardinal rule of statutory construction is to ascertain and effectuate legislative intention.'" *State v. Green*, 367 Md. 61, 81, 785 A.2d 1275 (2001) (citations omitted). When we interpret a statute, our starting point is always the text of the statute. *Adamson v. Correctional Medical Services, Inc.*, 359 Md. 238, 251, 753 A.2d 501 (2000). "[I] f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 473, 784 A.2d 569 (2001). The plain meaning rule is "elastic, rather than cast in stone[,]" and if "persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it." *Adamson*, 359 Md. at 251, 753 A.2d 501 (citing *Kaczorowski v. Mayor & City Council of Baltimore*, 309 Md. 505, 513–14, 525 A.2d 628 (1987)).

"[I]n determining a statute's meaning, courts may consider the context in which a statute appears, including related statutes and legislative history." *Ridge Heating, Air Conditioning & Plumbing v. Brennen*, 366 Md. 336, 350–51, 783 A.2d 691 (2001). "We may also consider the particular

problem or problems the legislature was addressing, and the objective it sought to attain." *Sinai Hosp. of Baltimore v. Dep't of Employment and Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). "This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense." *Adamson,* 359 Md. at 252, 753 A.2d 501.

 It is also well settled that "the construction of a law by the agency charged with its enforcement, acquiesced in by the legislature, is entitled to great weight and should not be disregarded except for the strongest and most urgent reasons." *Jackson Marine Sales, Inc., v. State Dep't of Assessments and Taxation,* 32 Md.App. 213, 217, 359 A.2d 228 (1976). We afford deference to an agency's consistent and long-standing construction of a statute because "the agency is likely to have expertise and practical experience with the statute's subject matter." *Marriott Employees Federal Credit Union v. MVA,* 346 Md. 437, 445, 697 A.2d 455 (1997).

 "In interpreting regulations, we 'generally employ the same rules applicable to the interpretation of statutes.'" *Ward v. Dep't of Pub. Safety & Corr. Servs.,* 339 Md. 343, 351, 663 A.2d 66 (1995) (quoting *Chesapeake Indus. Leasing Co., Inc., v. Comptroller,* 331 Md. 428, 440, 628 A.2d 234 (1993)). However, "agency regulations must be consistent with the letter and spirit of the law under which the agency acts." *Medstar Health v. Maryland Health Care Comm'n,* 376 Md. 1, 20, 827 A.2d 83 (2003). With the exception of the provisions relating to criminal sanctions, the provisions of the Maryland Public Ethics Law are to be construed liberally to effectuate the purpose of "maintaining the [people's] highest trust in their government officials and employees[.]" S.G. § 15–4101(a)(1), (c).

 As explained above, S.G. § 15–713(1), which became effective November 1, 2001, prohibits a "registered lobbyist" from being "engaged for lobbying purposes for compensation that is dependent in any manner on" "(ii) the outcome of any executive action relating to the solicitation or securing of a

procurement contract; or (iii) any other contingency related to executive action or legislative action." *Black's Law Dictionary* 549 (7th ed.1999) defines "engage" as "[t]o employ or involve oneself; to take part in; to embark on." Likewise, "engagement" is defined, in relevant part, as "[a] contract or agreement involving mutual promises." *Id.* We are persuaded that the legislative intent as expressed in the language of the statute supports an interpretation that entering into a contract for "lobbying purposes" for compensation is an "engage[ment]" and that the "engage[ment]" continues for so long as the contract remains in effect.

"Lobbying" includes "any act that requires registration under [S.G.] § 15–701[.]" Similarly, a "regulated lobbyist," to whom S.G. §§ 15–713(1) and 15–405(e) are applicable, is defined as "an entity[,] [including a person [4]], that is required to register with the Commission pursuant to [S.G.] § 15–701." State Government § 15–701 provides, in relevant part:

(a) *Registration required.*—Unless exempted under subsection (b) of this section, an entity shall register with the Ethics Commission as provided in this subtitle, and shall be a "regulated lobbyist" for the purposes of this title, if, during a reporting period, the entity:

(1) for the purpose of influencing any legislative action or, as to the development or adoption of regulations or the development or issuance of an executive order, executive action:

(i) 1. communicates with an official or employee of the Legislative Branch or Executive Branch in the presence of that official or employee; and

2. exclusive of the personal travel or subsistence expenses of the entity or a representative of the entity, incurs expenses of at least $500 or earns at least $2,500 as compensation for all such communication and activities

---

**4.** State Government § 15–102(i) defines "entity" to include "a person" or "a government or instrumentality of government."

relating to the communication during the reporting period; or

(ii) 1. communicates with an official or employee of the Legislative Branch or Executive Branch; and

2. earns at least $5,000 as compensation for all such communication and activities relating to the communication during the reporting period;

(2) in connection with or for the purpose of influencing any executive action, spends a cumulative value of at least $100 for gifts, including meals, beverages, and special events, to one or more officials or employees of the Executive Branch;

(3) subject to subsection (b)(4) of this section, is compensated to influence executive action on a procurement contract that exceeds $100,000;

(4) subject to subsection (b)(5) of this section, is compensated by a business entity to influence executive action to secure from the State a business grant or loan with a value of more than $100,000 for the business entity;

(5) spends at least $2,000, including expenditures for salaries, contractual employees, postage, telecommunications services, electronic services, advertising, printing, and delivery services for the express purpose of soliciting others to communicate with an official to influence legislative action or executive action; or

(6) spends at least $2,500 to provide compensation to one or more entities required to register under this subsection.

(b) *Exempted activities.*—(1) The following activities are exempt from regulation under this subtitle:

(i) appearances as part of the official duties of an elected or appointed official or employee of the State, a political subdivision of the State, or the United States, to the extent that the appearance is not on behalf of any other entity;

(ii) actions of a member of the news media, to the extent the actions are in the ordinary course of gathering and disseminating news or making editorial comment to the general public;

(iii) representation of a bona fide religious organization to the extent the representation is for the purpose of protecting the right of its members to practice the doctrine of the organization;

(iv) appearances as part of the official duties of an officer, director, member, or employee of an association engaged exclusively in representing counties or municipal corporations, to the extent that the appearance is not on behalf of any other entity; or

(v) actions as part of the official duties of a trustee, an administrator, or a faculty member of a nonprofit independent college or university in the State, provided the official duties of the individual do not consist primarily of attempting to influence legislative action or executive action.

(2) The following activities are exempt from regulation under this subtitle if the individual engages in no other acts during the reporting period that require registration:

(i) professional services in drafting bills or in advising clients on the construction or effect of proposed or pending legislation;

(ii) appearances before the entire General Assembly, or any committee or subcommittee of the General Assembly, at the specific request of the body involved;

(iii) appearances before a legislative committee at the specific request of a regulated lobbyist, if the witness notifies the committee that the witness is testifying at the request of the regulated lobbyist;

(iv) appearances before an executive unit at the specific request of the executive unit involved; or

(v) appearances before an executive unit at the specific request of a regulated lobbyist, if the witness notifies the executive unit that the witness is testifying at the request of the regulated lobbyist.

Bereano registered as a "regulated lobbyist" with the Commission on November 14, 2001, indicating his "expectat[ion] to act or employee someone to act" between November 1, 2001 to October 31, 2002, on "any and all legislative [and] executive

matters concerning staffing and case management, foster care, children, and social services issues." At the hearing, he testified that he "never lobbied anybody on behalf of Mr. Traina since [he] was hired in September 2001," "never sought in the [S]tate of Maryland any government, and . . . ha[s] not worked on any government contract for [Traina] at all," and that he registered as a regulated lobbyist for Mercer only "out of an abundance of caution."

Noting that Bereano registered as a lobbyist;[5] filed an amended lobbying activity report indicating that, between November 1, 2001 and April 30, 2002, he had received $16,000 in compensation for lobbying services; reported that he made $200 in gifts to officials during that period that he could not explain; and billed Mercer $1,197.73 for "legislative meals and expenses" and "legislative expenses" between December 1, 2001 and May 1, 2002, the Commission found Bereano's testimony that he had not performed lobbying services on Mercer's behalf "less than credible." *See* S.G. § 15–701(a)(1)(ii).

Bereano's testimony conflicted with the filings he submitted to the Commission under oath. Giving proper deference to the authority vested with the Commission to resolve disputes of fact and draw inferences from the facts, we cannot say that the Commission's findings that Bereano had performed lobbying activity requiring registration under S.G. § 15–701 and was, therefore, a "regulated lobbyist" as defined by S.G. § 15–102(hh) are not supported by substantial evidence in the record. In fact, in his brief, Bereano appears to concede that his receipt of the $2,000 monthly retainer and activities "required" him to register as a lobbyist for Mercer and file lobbying activity reports and disclosures.

---

5. S.G. 15–703, provides, in pertinent part:
 (d)*Registration filing—Time—*(1) A regulated lobbyist who is not currently registered shall register within 5 days after first performing an act that requires registration under" S.G. § 15–701.
 (2) A regulated lobbyist shall file a new registration form on or before November 1 of each year if, on that date, the regulated lobbyist is engaged in lobbying.
 We note the use of the words "engaged in lobbying" in this provision.

We next consider whether the Fee Agreement, under which Bereano performed lobbying services, provided for compensation contingent upon the outcome of legislative or executive action. Maryland adheres to the objective law of contract interpretation, which "generally requires giving legal effect to the clear terms of a contract and bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." *Calomiris v. Woods*, 353 Md. 425, 432, 727 A.2d 358 (1999) (citing *Equitable Trust Co. v. Imbesi*, 287 Md. 249, 271–72, 412 A.2d 96 (1980)). "The requirement that courts give legal effect to the unambiguous provisions of a contract and the rule that prohibits the admission of parol evidence for ascertaining the parties' intent provide a necessary legal foundation for the certainty of contracting parties." *Calomiris*, 353 Md. at 433, 727 A.2d 358.

Referring to Traina's June 12, 2002 letter, Bereano claims that it was not the intent of the parties to the Fee Agreement to create a contingency fee, but only to recognize that he would need to perform additional services for any contracts that he may secure for Mercer. While appellant recognizes that the language may resemble a contingency fee, he argues that the parties never contemplated that he would lobby, nor did he lobby, to secure State agency contracts. In addition, the Fee Agreement was intended to apply to multiple jurisdictions where contingency fee lobbying was not prohibited.

Despite Bereano's explanations of the intentions of the parties, the plain language of the Fee Agreement supports the Commission's interpretation that Bereano was "engaged for lobbying purposes" on behalf of Mercer "to develop and obtain contracts and arrangements with ... State government agencies and departments." For his success in obtaining "contract[s] and performance of services ... with *any* government entity, unit or agency in the State of Maryland," he was to be compensated one percent of the first year receivable in addition to the $2,000 monthly retainer. (Emphasis added.) In fact, the securing of government contracts was such an integral part of the Fee Agreement that all of the provisions of the Fee Agreement were subject to modification "except for

the provision and understanding ... to compensate [Bereano] when and after any contract is entered into [with] a government unit." Even if the percentage of the first year receivable was intended as a flat fee for continuing services, the contract still provides for compensation that is contingent upon the executive action.[6]

Even if the Fee Agreement included Bereano's activities on Mercer's behalf in jurisdictions other than Maryland, by its terms, the Fee Agreement clearly related to, and included, Bereano's activities before Maryland's executive and legislative branches. Additionally, the Commission found, and the record supports the finding, that Bereano performed services under the agreement necessitating his registration as a "regulated lobbyist" under S.G. § 15–701.

---

**6.** This conclusion is consistent with prior interpretations of the Commission regarding lobbying for contingency fee contracts. In advisory Opinion No. 88–13 (June 28, 1988), the Commission considered whether a contract between a law firm and a client, under which the law firm would be compensated a flat fee for future legal services upon the award of a State procurement contract to the client, violated a predecessor to S.G. § 15–713(1), Md.Code of Maryland Art. 40 A § 5–104. *Opinions of the Maryland State Ethics Commission: 1987–98 Opinions 87 through 98–10* 1307. Under the proposed agreement, the law firm's being retained to implement future contracts was contingent upon the client being awarded the contract. Although not registered as a lobbyist on behalf of the client, the law firm proposed to represent the client in the bidding and negotiation in relation to the State procurement contract. Under the Commission's broad interpretation of "legislative action," which included "almost any matter potentially within the jurisdiction of the [l]egislature," the law firm's involvement with members of the legislature in relation to the contract would implicate the lobbying registration requirements of the Public Ethics Law. *Id.* at 1310. Moreover, even though the fee agreement did not provide for compensation until the client was awarded the contract at issue, the Commission opined that, generally, compensation during a particular reporting period is done on an accrual basis so that "[t]he registration requirements of the [l]aw can not be avoided simply by agreeing that payment will be delayed until a later date." *Id.* Therefore, "the promise of a future retainer ... can be viewed as a compensation, reward, benefit, or value to be transferred for services rendered as a [lobbying] registrant." *Id.* at 1310–11. And, "[i]f such an agreement is contingent upon the successful conclusion of some legislative action, then in [the Commission's] view, the prohibition of [Art. 40A] § 5–104 would be violated." *Id.* at 1311.

Even if Bereano did not actually perform lobbying or other services initiating the contingency provisions of the Fee Agreement,[7] we are not persuaded that the Commission erred in finding him in violation of S.G. § 15–713(1). As explained above, the legislature sought to prohibit "regulated lobbyists" from "being engaged," *i.e.*, contracting, for lobbying purposes for compensation that was contingent upon legislative or executive action. Because the "engagement" continues for so long as the contract is in effect, an entity engaged under such an agreement is in violation of the statute until the termination of the agreement or until the entity is no longer a "regulated lobbyist."

The effective date of S.G. §§ 15–405 and 15–713 was November 1, 2001. Bereano registered as a lobbyist for Mercer on November 14, 2001, indicating his intention to lobby on its behalf for "any and all legislative and executive matters concerning staffing and case management foster care, children and social services issues." According to the Commission's findings, which are supported by substantial evidence in the record, Bereano's registration was required under S.G. § 15–701. As a result, the Commission was authorized under S.G. § 15–405(e) to sanction Bereano for any violation of Subtitle 7 of the State Government Article.[8]

---

7. The Commission found that Bereano had not been compensated under the contingency provisions of the Fee Agreement.

8. Pursuant to S.G. § 15–405 the Commission is only authorized to sanction "regulated lobbyists." It may, however, issue an injunction against an entity that has entered into a contract that violates State Ethics Laws. With regard to "respondents" that the Commission determines have violated Maryland's Ethics Laws but are not "regulated lobbyists," S.G. § 5–405(c) authorizes the Commission to:

(1) issue an order of compliance directing the respondent to cease and desist from the violation;
(2) issue a reprimand; or
(3) recommend to the appropriate authority other appropriate discipline of the respondent, including censure or removal, if that discipline is authorized by law.

Under S.G. § 15–405(d), the Commission may not sanction an individual who enters into a contract that provides for lobbying contingent on executive or legislative action if the individual takes no action under

In support of our interpretation that the legislature sought to prohibit the mere *contracting* for lobbying purposes for contingency fee compensation, we note that, in enacting the Public Ethics Law, the General Assembly "declare[d] that the people have a right to be assured that the impartiality and independent judgment of those officials and employees will be maintained," and found it "evident that this confidence and trust is eroded when the conduct of the State's business is subject to improper influence or even *the appearance of improper influence.*" S.G. § 15–101(a) (emphasis added). Interpreting S.G. § 15–713(1) to prohibit only successful lobbying for contingency compensation would not serve the stated legislative purpose. Therefore, that Mercer never "successfully bid on any government contracts" and Bereano was never compensated under the contingency fee provisions are not relevant.

Nevertheless, the Commission may only sanction an individual for "knowin[g]" and "willfu[l]" violations. State Government § 15–405 provides, in relevant part:

(d) *Same—Subtitle 7.*—If the Ethics Commission determines that a respondent has violated Title 7 of this title, the Ethics Commission may:

(1) require a respondent who is a regulated lobbyist to file any additional reports or information that reasonably relates to information required under §§ 15–730 and 15–704 of this title;

(2) impose a fine not exceeding $5,000 for each violation; and

(3) subject to subsection (e) of this section, suspend the registration of a regulated lobbyist.

---

a contract because the individual would not be required to register as a regulated lobbyist under S.G. § 15–701; that is not the case here. Nor does this case concern a regulated lobbyist who enters into a contingency fee agreement for lobbying purposes for a different client than the one for which the entity was required to register under S.G. §§ 15–701 and 15–703.

(e) *Suspension or revocation of registration.*—(1) If the Ethics Commission determines it necessary to protect the public interest and the integrity of the governmental process, the Ethics Commission may issue an order to:

(i) suspend the registration of an individual regulated lobbyist if the Ethics Commission determines that the individual regulated lobbyist:

1. has knowingly and willfully violated Subtitle 7 of this title . . .

According to Bereano, the "knowingly and willfully" language of S.G. § 15–405(e) imposes a *"scienter"* requirement, whereby the Commission must find that a respondent deliberately intended to violate State Ethics Laws before it is empowered to issue a sanction. As the Court of Appeals explained in *Attorney Grievance Commission v. Tayback,* 378 Md. 578, 837 A.2d 158 (2003):

" 'Willful' has received four different constructions from the courts. The first, and most restrictive, is that an act is wilful only if it is done with a bad purpose or evil motive-deliberately to violate the law. A second interpretation considers an act to be willful 'if it is done with intent to commit the act and with a knowledge that the act is in violation of the law.' That construction does not require that the defendant possess a sinister motivation, but, like the first interpretation, it does require knowledge that the act is unlawful. The third interpretation 'requires only that the act be committed voluntarily and intentionally as opposed to one that is committed though inadvertence, accident, or ordinary negligence.' Under that approach, '[a]s long as there is an intent to commit the act, there can be a finding of willfulness even though the actor was consciously attempting to comply with the law and was acting with the good faith belief that the action was lawful.' What is required is 'an objective intent to commit the act but not necessarily a knowledge that the act will bring about the illegal result.' Finally . . . some courts have gone so far as to find an act willful even though it was not committed

intentionally, but through oversight, inadvertence, or negligence."

*Id.* at 589, 837 A.2d 158 (quoting *Deibler v. State,* 365 Md. 185, 776 A.2d 657 (2001)). The *Tayback* Court noted that, "in the majority of applications, the third definition was accepted, *i.e.,* that the act be committed voluntarily and intentionally, not accidentally." *Id.* Moreover, the Court of Appeals found that the third definition had been consistently applied in attorney grievance matters.

For purposes of S.G. § 15–405, we agree with the Commission that a suspension or revocation of registration is appropriate where it is shown that the respondent intentionally and voluntarily entered into a lobbying agreement in violation of the S.G. § 15–713(1). Therefore, we are also not persuaded that the Commission erred as a matter of law in reprimanding Bereano, fining him, suspending his lobbying registration, and in prohibiting him from engaging in lobbying activity for a period of ten months. We are similarly not persuaded that the Commission's decision to do so constituted an abuse of the discretion afforded to it under S.G. § 15–405(e).

## II.

Bereano also contends that the Commission retroactively applied the provisions of S.G. § 15–405, in violation of the Court of Appeals's decision in *State Ethics Commission v. Evans,* 382 Md. 370, 855 A.2d 364 (2004). He explains that the Fee Agreement was entered into on September 13, 2001, before the effective date of S.G. § 15–405. He claims the only act that violated S.G. § 15–713(1) for which he could be sanctioned was his entering into the Fee Agreement and notes that, at that time, the Commission was without authority to sanction a regulated lobbyist. Because he did not actually engage in any lobbying for State procurement contracts and S.G. § 15–713 does not provide for a continuing violation, appellant claims his subsequent registration and filings with the Commission are not relevant.

In *State Ethics Commission v. Evans*, 382 Md. 370, 855 A.2d 364 (2004), Evans, a well known Maryland registered lobbyist, was convicted of nine counts of wire and mail fraud in the United States District Court as a result of his lobbying activities. He was sentenced to thirty months' imprisonment on September 29, 2000. After serving his sentence, Evans registered as a regulated lobbyist on behalf of five clients on May 24, 2002.

Thereafter, the Commission initiated a complaint against Evans pursuant S.G. § 13–405(e)(1)(ii), which, effective November 1, 2001, authorized the Commission to "revoke the registration of an individual regulated lobbyist if the Ethics Commission determines that, based on acts arising from lobbying activities, the individual regulated lobbyist has been convicted of bribery, theft, or other crime involving moral turpitude." Based upon his wire and mail fraud convictions, the Commission revoked Evans's registrations. When the Circuit Court for Anne Arundel County reversed the Commission's revocation on the grounds that the Commission had impermissibly applied S.G. § 15–405(e) retroactively, the Court of Appeals granted *certiorari* to consider whether the legislature intended to authorize the Commission to suspend or revoke the registration of regulated lobbyist for acts occurring prior to the effective date of the statute.

In holding that the Commission's decision constituted an erroneous retroactive application of S.G. § 15–405(e), in contradiction of the legislative intent, the Court of Appeals noted that, with certain limited exceptions, including the prohibition of engaging in lobbying activity for compensation contingent on executive or legislative action, between 1979 and October 31, 2001, "the law governing lobbyists was essentially restricted to requiring them to register with the State Ethics Commission and to file semi-annual reports." *Evans*, 382 Md. at 374, 855 A.2d 364. While lobbyists were subject to criminal prosecution under S.G. § 15–903, the Commission was not authorized to suspend or revoke a lobbyist for ethics violations. It could only issue a cease and desist order, which it could then seek to enforce through judicial action.

Recognizing the lack of "clear ethical standards and effective administrative enforcement" of lobbying activity, in 1999, the legislature created the Study Commission on Lobbyist Ethics to "collec[t] information about lobbying practices, formulat[e] a Code of Ethics for lobbyists, propos[e] legislation, and repor[t] its findings to the Governor and the General Assembly." *Id.* at 374–75, 855 A.2d 364. In its report, the Study Commission recommended, among other things, "prohibiting certain conduct on the part of lobbyists" and "authorizing the State Ethics Commission to impose administrative fines and to suspend or revoke a lobbyist's registration for certain ethical violations." *Id.* at 375, 855 A.2d 364.

The Study Commission's recommendations were enacted by the 631st Act of the 2001 Session, which, effective on November 1, 2001, created, among other things, S.G. §§ 15–405 and 15–713. State Government § 15–405(e) permits the Commission to revoke the registration of any regulated lobbyist based upon a conviction for a crime of moral turpitude that arose from lobbying activities. The Commission is required to initiate a complaint within two years of the date the conviction became final.

In determining whether the legislature intended to authorize the Commission to sanction regulated lobbyists for convictions occurring prior to November 1, 2001, the *Evans* Court explained the following general principles relating to the retroactive application of statutes:

> "(1) statutes are presumed to operate prospectively unless a contrary intent appears; (2) a statute governing procedure or remedy will be applied to cases pending in court when the statute becomes effective; (3) a statute will be given retroactive effect if that is the legislative intent; but (4) even if intended to apply retroactively, a statute will not be given that effect if it would impair vested rights, deny due process, or violate the prohibition against *ex post facto* laws."

*Id.* at 381, 855 A.2d 364 (quoting *Allstate Ins. Co. v. Kim,* 376 Md. 276, 289, 829 A.2d 611 (2003)).

Additionally, in applying those principles to the determination of whether a particular statute is to be given retroactive application, courts employ the following two-part test:

"First, [the Court] must determine whether the [l]egislature intended the statute to have the kind of retroactive effect that is asserted. That implicates the first and third principles. Applying the presumption of prospectivity, a statute will be found to operate retroactively only when the [l]egislature clearly expresses an intent that the statute apply retroactively."

\* \* \*

"If [the Court] conclude[s] that the [l]egislature did intend for the statute to have retroactive effect, [the Court] must then examine whether such effect would contravene some Constitutional right or prohibition. That implicates the second and fourth principles."

*Evans*, 382 Md. at 381–82, 855 A.2d 364 (quoting *Kim*, 376 Md. at 289–90, 829 A.2d 611). Finally, the *Evans* Court explained that, although a statute may be applied in proceedings occurring after its effective date, so long as that application regulates activity occurring prior to the effective date of the statute, its application is retroactive. *Evans*, 382 Md. at 382, 855 A.2d 364.

As applied to Evans, the Court of Appeals determined that S.G. § 15–405(e) was applied prospectively "in the sense that the registrations were filed after the effective date," but "the statute was clearly applied retroactively, . . ., in that the sole ground for revocation was an act—a conviction—that occurred prior to the effective date." *Id.* Therefore, S.G. § 15–405(e) was "applied in a way that 'determine[d] the legal significance of acts or events that occurred prior to its effective date.'" *Id.* at 382, 855 A.2d 364 (quoting *Kim*, 376 Md. at 289, 829 A.2d 611). The *Evans* Court noted the legislature is presumed to know the Court's holdings concerning the retroactivity of legislation, and explained that had the legislature "wanted the statute to apply to Evans or persons in his status, it would have to have taken some affirmative action, expressly or by

necessary implication, to make that clear[.]" *Evans,* 382 Md. at 384, 855 A.2d 364. Absent such a clear legislative intent, the longstanding presumption against retroactive application of legislation was applicable, and the Court affirmed the circuit court's reversal of the Commission's sanctioning of Evans.

■ We are persuaded that the application of S.G. § 15–405 in the instant case is distinguishable from that in *Evans.* In *Evans,* the convictions, *i.e.,* the act occasioning the revocation of his registrations, occurred prior to November 1, 2001. Although Bereano entered into the Fee Agreement with Mercer before the effective date of S.G. § 15–405,[9] he acknowledged, and the Commission found, that the Fee Agreement controlled his activities with Mercer until June 12, 2002, when the contingency fee language was removed. Because an entity is in violation of S.G. § 15–713(1) under a lobbying services contract providing for compensation contingent upon legislative or executive action until the contract is terminated or the entity is no longer a regulated lobbyist, Bereano was engaged under the Fee Agreement for lobbying purposes for compensation contingent upon the outcome of executive action after November 1, 2001.

Bereano's retroactive application argument focuses on the entering into the Fee Agreement as the critical act and the date of the Fee Agreement as the critical date. He contends that a regulated lobbyist is not in continuing violation of S.G. § 15–713 simply because he or she remains "engaged for lobbying purposes" under a contingency fee agreement. This would mean that a regulated lobbyist could continue to lobby under a contract entered into prior to November 1, 2001, providing for a contingency fee, and not be subject to the Commission's sanctioning authority under S.G. § 15–405.

---

**9.** As explained above in September 2001, the Public Ethics Law prohibited being engaged for lobbying activity for compensation contingent upon legislative or executive action. S.G. (1984, 1999 Repl.Vol.) § 5–706.

That result, we believe, would appear illogical and clearly contrary to the legislative intent.

## III.

Bereano also contends that the Commission erred in applying the so called "missing witness rule." "The 'missing witness rule' or 'empty chair doctrine' permits an adverse inference to be drawn from a party's failure to call a material witness, when the circumstances are such that the party should naturally have called the missing witness." Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 409(B), at 142 (3d ed.1999). Discussion of the rule most often arises in the context of the appropriateness of granting a jury instruction.

The missing witness rule has long been applied by Maryland courts in civil cases. *Christensen v. State,* 274 Md. 133, 135, 333 A.2d 45 (1975); *Hayes v. State,* 57 Md.App. 489, 495, 470 A.2d 1301 (1984). As explained by the Court of Appeals in *Hoverter v. Dir. of Patuxent Inst.,* 231 Md. 608, 609, 188 A.2d 696 (1963):

> In a civil case it is well settled that failure of a party to produce an available witness who could testify on a material issue, if not explained, gives rise to an inference that the testimony would be unfavorable, and is a legitimate subject of comment by counsel in argument to the jury.

Elsewhere, the Court has said: "The unfavorable inference applies, however, only where it would be most natural under the circumstances for a party to speak, call witnesses, or present evidence." *Radin v. Supervisor of Assessments of Montgomery County,* 254 Md. 294, 301, 255 A.2d 413 (1969).

The Court of Appeals first applied the missing witness rule in a criminal case in *Christensen* :

> "The failure to call a material witness raises a presumption or inference that the testimony of such person would be unfavorable to the party failing to call him, but there is no such presumption or inference where the witness is not available, or where his testimony is unimportant or cumulative, or where he is equally available to both sides. The

presumption or inference that the testimony of a missing witness would be unfavorable is applied most frequently when there is a relationship between the party and the witness, such as a family relationship, an employer-employee relationship, and, sometimes, a professional relationship."

*Christensen,* 274 Md. at 134–135, 333 A.2d 45 (quoting 1 Underhill *Criminal Evidence* § 45 (rev. 6th ed. P. Herrick 1973)). Accord *Davis v. State,* 333 Md. 27, 48, 633 A.2d 867 (1993); *Robinson v. State,* 315 Md. 309, 314, 554 A.2d 395 (1989).

This Court later indicated that, while the missing witness rule is sometimes "referred to as a presumption," it "is really a [recognition of a] permissible inference." *Yuen v. State,* 43 Md.App. 109, 113, 403 A.2d 819 (1979). There, the Court explained:

The court cannot instruct a jury that it *must* presume unfavorable testimony upon the absence of a witness. The instruction the *advisory* instruction in Maryland is that the jury *may* infer. *See United States v. Stulga,* 584 F.2d 142, 145 n. 1 ( [6th Cir.] 1978). The instruction becomes merely a highlighting of a significant void in a party's case; but even in the absence of an instruction, the jury is not precluded from so inferring. Inferences of all types are always favorable to the factfinders.

The failure to grant an affirmative instruction does not remove the availability of the inference. As a consequence, whatever prejudice may usually come from not giving an advisory instruction is diminished, because the inferential thought process is still available. The prejudice is simply that such an inference is not given preferred instructional attention over any other inferences available from the testimony or absence of testimony.

*Id.* at 113–14, 403 A.2d 819 (footnote omitted). *See also Patterson v. State,* 356 Md. 677, 684–85, 741 A.2d 1119 (1999)(citing *Yuen* with approval and opining that "[a]n evidentiary inference, such as a missing evidence or missing witness inference, however, is not based on a legal standard

but on the individual facts from which inferences can be drawn and, in many instances, several inferences may be made on the same set of facts").

In this case, the Commission, in its opinion, recounted Bereano's explanation that the "legislative meals and expenses" and "legislative expenses" for which he sought reimbursement from Mercer were, in fact, social events that he attended with Traina and where no lobbying activity occurred. At such events, according to Bereano, he would "pick up" the cost of his meal as well as Traina's and bill Mercer later. Bereano also claimed that the language relating to compensation of one percent of first year receivables for government contracts entered into by Mercer was added at Traina's request and that the parties did not contemplate that Bereano would lobby to secure State agency contracts.

In explaining that it did not find Bereano's testimony credible, the Commission remarked that Traina was present on Bereano's witness list, but Bereano did not call him to testify. The Commission determined that, "[b]ecause Mr. Traina did not appear and testify, we make the inference pursuant to the 'missing witness rule' that his testimony would not have supported [Bereano's] testimony particularly in view of [Bereano's] incongruous testimony." In a footnote, the Commission quoted *Hayes,* 57 Md.App. at 495, 470 A.2d 1301, as follows:

> "The Court of Appeals of Maryland has consistently applied th[e] [missing witness] rule in civil cases and held that where a party fails to take the stand to testify as to facts peculiarly within his knowledge, or fails to produce evidence (*e.g.,* testimony by certain witnesses) the fact finder may infer that the testimony not produced would have been unfavorable to that party."

Here, it was for the Commission, as the fact finder, to resolve disputes of fact and to draw inferences from those facts. *CBS, Inc. v. Comptroller of Treasury,* 319 Md. 687, 698, 575 A.2d 324 (1990) " '[I]t is the agency's province to resolve conflicting evidence' and to draw inferences from that evi-

dence." (quoting *Ramsay, Scarlett & Co. v. Comptroller of Treasury,* 302 Md. 825, 834–35, 490 A.2d 1296 (1985)).

In *Garrison v. State,* 88 Md.App. 475, 486–87, 594 A.2d 1264 (1991), a criminal case in which the appellant's father was a key figure in his alibi, we reasoned that "appellant's father was peculiarly available to appellant and less available to the State; his testimony would have buttressed the appellant's credibility; his father was not called to testify in his behalf; and the relationship between the appellant and his father would naturally be one of interest or affection." "Thus," we concluded, "it may be assumed, at the least, that appellant's father could not substantiate [appellant's alibi]; and, at worst, it may be assumed that the testimony of appellant's father would have been in contravention of the testimony appellant would have offered." *Id.* at 487, 594 A.2d 1264.

 In this case, where credibility was a particularly important issue, a reasonable trier of fact could reasonably conclude that if Traina's testimony would have corroborated Bereano's testimony and buttressed his credibility, it would have been natural to have called him for that purpose. *See Bruce v. State,* 318 Md. 706, 569 A.2d 1254 (1990); *Robinson v. State,* 315 Md. 309, 554 A.2d 395 (1989). Traina negotiated and signed the fee agreement on behalf of Mercer. He was, for all practical purposes, a party to that agreement, and the facts about the intention of the parties in regard to the agreement were peculiarly within his knowledge. Not only had Traina been included on Bereano's witness list, but because of their personal and business relationship, Bereano was obviously in the better position to know what his testimony would be. Therefore, the Commission could draw the adverse inference from Bereano's failure to call Traina to testify about the intent of the lobbying contract and to support Bereano's explanation of the billing for "legislative meals and expenses."

Rather than offering an explanation of why he could not or did not call Traina, appellant directs our attention to one of the exceptions identified in *Christensen* : " '[T]here is no such ... inference where the witness ... is equally available to

both sides.' " *Christensen,* 274 Md. at 133, 333 A.2d 45 (quoting Underhill at § 45). *Accord Davis,* 333 Md. at 48, 633 A.2d 867; *Robinson,* 315 Md. at 314, 554 A.2d 395. This Court said in *Yuen* that the party against whom the inference is drawn must " 'ha[ve] it peculiarly within his power to produce' " the missing witness, *Yuen v. State,* 43 Md.App. 109, 112, 403 A.2d 819 (1979) (quoting *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893)). In *Hayes,* we stated it somewhat differently and said that the witness must be "peculiarly available" to that party, *Hayes,* 57 Md.App. at 494, 470 A.2d 1301.

In *Hayes,* we noted that, whereas "[i]n civil cases, the unfavorable inference applies where it would be most natural under the circumstances for a party to speak, or present evidence," the Supreme Court of the United States, "in applying the rule to criminal cases articulated the rule somewhat more restrictively ... in that the witness must not only be 'naturally' accessible to the party but must be 'peculiarly' so." *Hayes,* 57 Md.App. at 495, 470 A.2d 1301 (citing *Graves,* 150 U.S. at 121, 14 S.Ct. 40). We reasoned: "The primary justification in criminal cases for the stringent requirement that the witness be 'peculiarly' within the control of the party is the need to protect the defendant's Sixth Amendment right of confrontation." *Hayes,* 57 Md.App. at 499, 470 A.2d 1301.

More recently, this Court has utilized this same criminal case terminology regarding witness availability in civil cases. *See S. Mgmt. Corp. v. Mariner,* 144 Md.App. 188, 199, 797 A.2d 110 (2002) (stating that, "[f]or the instruction to be warranted, the missing witness must be in the 'peculiar control' of one party") (citing *Hayes,* 57 Md.App. at 494–95, 470 A.2d 1301); *DiLeo v. Nugent,* 88 Md.App. 59, 70, 592 A.2d 1126 (1991) (stating that "a missing witness instruction is improper when a witness is equally available to both sides") (citing *Hayes,* 57 Md.App. at 494–95, 470 A.2d 1301).[10] For

---

**10.** The Court of Appeals recently adopted a Rules Committee note, citing *DiLeo v. Nugent,* referring generally to the missing witness rule as

the purposes of this case, we need not decide whether there is a meaningful difference in the availability requirement between civil cases, which this is, and criminal cases. As we shall explain, we are persuaded that Traina was peculiarly available to Bereano, rather than equally available to both parties.

Appellant contends that because Traina was equally available to the Commission through subpoena, he was not peculiarly within Bereano's control. The appellant in *Davis* made a similar argument in regard to the mother of his children, who was present at the trial and clearly subject to subpoena. Citing *United States v. Young*, 463 F.2d 934, 942 (D.C.Cir. 1972) (citing *Burgess v. United States*, 440 F.2d 226 (D.C.Cir. 1970); *Stewart v. United States*, 418 F.2d 1110, 1115 (D.C.Cir. 1969)), the Court of Appeals stated that " ' "availability" of a witness to the Government must be judged "practically as well as physically." . . . And whether a person is to be regarded as equally available to both sides may depend not only on physical availability but on his "relationship" to the parties.' " *Davis*, 333 Md. at 49, 633 A.2d 867. Relationships that most frequently generate an adverse "missing witness" inference include " ' "a family relationship, an employer-employee relationship, and, sometimes, a professional relationship." ' " *Id.* at 50, 633 A.2d 867 (quoting *Robinson v. State*, 315 Md. 309, 314–315, 554 A.2d 395 (1989) (citing *Christensen*, 274 Md. at 134–135, 333 A.2d 45)). The Court concluded:

> Underlying this principle is the realization that despite a party's theoretical ability to subpoena the witness's testimony, there is a practical concern that certain relationships may engender a very strong bias which would undermine the utility of that witness's testimony.

*Davis*, 333 Md. at 50, 633 A.2d 867. *See also McDuffie v. State*, 115 Md.App. 359, 693 A.2d 360 (1997); *Garrison v. State*, 88 Md.App. 475, 594 A.2d 1264 (1991); 2 *McCormick on Evidence* § 264 (Kenneth S. Broun ed., 6th ed., Supp.2006);

---

the "unexplained failure to produce a witness to whom one has superior access." Committee Note to Md. Rule 5–804(b)(5).

Robert H. Stier, Jr., *Revisiting the Missing Witness Inference: Quieting the Loud Voice from the Empty Chair,* 44 Md. L.Rev. 137, 157–58 (1985).

When we direct our focus to Traina's relationship to the parties, we see that the Commission had no relationship with him; Traina's relationship was with Bereano. Traina may have been physically available to the Commission by subpoena, but in a practical sense, he was not equally available to the parties. This personal and business relationship gave Bereano superior access to Traina and made Traina "peculiarly" available to Bereano. There is no indication that that relationship had changed, and, in the absence of some explanation, it would seem most natural for Bereano to call Traina as a witness in this case.

In his reply brief, in regard to his failure to offer some explanation for not calling Traina to testify, Bereano argues that the Commission also gave no explanation for not calling Traina, whom it had interviewed, and who was apparently on its witness list, and that when Bereano was asked whether Traina would be called to testify and he answered that he would not, the Commission did not ask him for an explanation. During his testimony, Bereano invoked Traina's name numerous times, and at one point, presumably to bolster his testimony, Bereano said: "The truth of the matter is that this language [in the September 2001 letter] was Mr. Traina's language.... [H]e gave me this language and I know if he were here under oath he would say that to you as well...." Commission's case centered on the language of the fee agreement itself. Because Bereano was attempting to explain the intent of the agreement, and why he filed certain reports, it was incumbent upon him, and not the Commission, to explain Traina's absence. In the absence of some explanation for not calling Traina, we perceive no error in the Commission's drawing an adverse inference from his failure to testify.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**